HARRY J. ALTON, JR., *et al.*, Plaintiffs-Appellants, *v.* VICTOR KITT, M.D., *et al.*, Defendants-Appellees.

Fourth District    No. 16864

Opinion filed January 22, 1982.

James T. Mohan and Paul E. Adami, both of Mohan, Alewelt & Prillaman, of Springfield, for appellants.

Heyl, Royster, Voelker & Allen, of Springfield (Gary M. Peplow, of counsel), for appellees.

JUSTICE HEIPLE delivered the opinion of the court:
This is a medical malpractice case. The plaintiffs, Harry J. Alton and Doris Alton, sought to recover compensatory and exemplary damages from defendants, Victor Kitt, M.D., and the Springfield Clinic and its managing partners. The alleged negligent and wanton acts or omissions stem from the tonsillectomy and post-operative care of Mr. Alton. A trial commenced March 11, 1980. After a week of testimony, a Sangamon County jury returned a verdict for all defendants. Plaintiffs bring this appeal.

The facts take us back a full eight years. In July 1973, Mr. Alton met with Dr. Rubenstein, a managing partner of the Springfield Clinic, at the clinic's offices. Mr. Alton was referred there by Dr. Greening for a possible tonsillectomy due to chronic throat ailments. Dr. Rubenstein confirmed this diagnosis. Because of Mr. Alton's employment as a contractor, the operation was scheduled for January 14, 1974.

On January 13, 1974, Mr. Alton checked into St. John's Hospital in Springfield. Blood tests and blood pressure reading were conducted. Due to an injury to Dr. Rubenstein, Dr. Kitt, an associate of the Springfield Clinic, was to perform the surgery on January 14, 1974. Dr. Kitt testified that he reviewed the clinic's file and the results of the tests the hospital performed on Mr. Alton. He met the patient for the first time in the corridor which led to the operating room.

The operation lasted about 40 minutes. While in the recovery room, Mr. Alton began bleeding from the left lower tonsillar bed. He was re-

turned to the operating room and a surgical method employed by Dr. Kitt stopped the bleeding. Later, Mr. Alton was transferred to his hospital room. The Altons did not learn of this recovery room complication until almost one year later. ·

The next day, January 15, 1974, around noon, Mr. Alton was released from the hospital. Dr. Kitt telephoned the hospital authorizing the discharge. Dr. Kitt could not recall whether he ever personally checked the patient before releasing him. In any event, no medication was prescribed on release. The only information provided concerning post-operative care was furnished Mr. Alton by Dr. Rubenstein at their July 1973 meeting.

On Thursday, two days later, while at home, Mr. Alton started bleeding from his mouth again. Doris Alton, his wife, called the clinic and was told to bring Mr. Alton to the office. The Altons arrived at the Springfield Clinic 30 minutes later. Dr. Kitt examined Mr. Alton's throat and observed blood stains, but no active bleeding. Mr. Alton was nervous. A five-milligram injection of Valium, a tranquilizing agent, was administered by Dr. Kitt. The doctor left the room.

Ninety minutes later Mr. Alton began hemorrhaging from his mouth. Mrs. Alton exited at once and informed two nurses, Debbie Ciaccio and Gail Ratliff, of her husband's condition. Dr. Kitt was summoned. Both nurses entered the room and found Mr. Alton standing over the sink spitting blood into it. Mrs. Ciaccio put Mr. Alton in a dental-type chair which was cocked at a 45-degree angle. Dr. Kitt entered. What occurred next is not exactly clear from the record. It appears that Dr. Kitt was planning to begin suturing the left lower tonsillar bed—the source of the bleeding—in Mr. Alton's throat. Dr. Kitt testified that Mr. Alton was quite agitated, although this was disputed. Nonetheless, Dr. Kitt injected Mr. Alton intermuscularly with a 50-milligram dosage of meperidine (Demerol), a pharmaceutical narcotic. Since Dr. Kitt did not have the proper sutures, he sent Mrs. Ratliff to obtain them. During this time Mrs. Ciaccio was readying a suction machine. The testimony is conflicting as to whether it was ever used. At this point Mr. Alton either passed out or went into respiratory arrest.

When Mrs. Ratliff returned with the sutures, Dr. Kitt was performing external cardiac massage on Mr. Alton. This involves putting hand pressure on the patient's chest, then releasing the pressure, in order to activate the heart muscle. He told her to signal the clinic staff that an emergency existed. She complied immediately. The first physician to arrive was Dr. Castro, who was later joined by others. Because of the amount of blood in Mr. Alton's throat, air was not able to pass to the lungs. Accordingly, Mr. Alton's brain was deprived of life-saving oxygen and damaged. Quickly sizing up the situation, Dr. Castro placed Mr. Alton on the floor and

performed a tracheotomy in order to get an airway open from the outside of his throat. Since time was a critical factor, the tube of a ballpoint pen was used in this operation. Dr. Castro's efforts saved the patient's life but were too late to prevent damage to his brain.

When the ambulance arrived, Mr. Alton was transported to St. John's Hospital. He remained in a coma for 11 days. On January 20, 1974, Mr. Alton began bleeding from his mouth. Dr. Rubenstein was called to stop bleeding in the left lower tonsillar bed. The operation lasted six hours. It was successful. Altogether, Mr. Alton was hospitalized 44 days.

Because of brain damage, Mr. Alton was afflicted with speech impairment, an eye dysfunction, and body tremors. The latter occurred spontaneously, resulting in his body assuming a rigid posture, which he cannot control. Almost 30 days after release from the hospital, Mr. Alton began falling down while walking. Such spills resulted in the plaintiff breaking his shoulder, his teeth and suffering facial lacerations. In the last five to six years Mr. Alton has fallen, while walking, about 400 times.

In an attempt to alleviate this condition, Mr. Alton has been treated by at least eight physicians in three different States. He has undergone both speech and physical therapy. He has submitted to counselling and psychiatric care for the phobia he possesses about falling every time he walks. This lawsuit was filed January 5, 1976.

The third amended complaint, filed August 31, 1978, contains eight counts. Count I is the negligence count which claims Dr. Kitt was negligent in: failing to examine Mr. Alton or confer with him or Drs. Rubenstein or Greening prior to surgery; the performance of various surgical operations on Mr. Alton concerning the extraction of his tonsils; neglecting to examine Mr. Alton prior to discharge from the hospital and prescribe proper medication; and, in properly administering medication and rendering medical treatment of Mr. Alton at the Springfield Clinic on January 17, 1974. Count II realleged the bulk of count I and stated such acts or omissions were accomplished in a willful or wanton manner and sought punitive damages. Counts III and IV sought compensatory and punitive damages from the Springfield Clinic based on a theory of *respondeat superior.* Count V claimed loss of consortium on Mrs. Alton's behalf. Counts VI, VII, and VIII sought compensatory and exemplary damages based on the theory of *res ipsa loquitur.*

At the end of plaintiffs' case-in-chief, several components of the negligence count were withdrawn on plaintiffs' oral motion. This deleted the claims of negligence stemming from Dr. Kitt's failure to examine Mr. Alton prior to the tonsillectomy and confer with the patient and previous treating physicians. Also, the claims of negligence arising from postoperative bleeding immediately after the tonsillectomy, and the failure to

prescribe medication upon discharge from the hospital were excised at the plaintiffs' request. The trial court then entertained motions for directed verdicts.

After the hearing on such motions, the trial court struck counts IV, V, VII and VIII, entering directed verdicts thereon. All the negligence pleas were deleted except those claims concerning Dr. Kitt's improper administration of medication and cardiac massage treatment. Those two issues, within the structure of plaintiffs' theories of negligence and *respondeat superior* liability, were the only ones the jury considered. As to Mrs. Alton, the jury weighed her claim for loss of consortium. Also, the jury was permitted to decide punitive damages liability as to Dr. Kitt individually. Verdicts were returned for all defendants.

On appeal, plaintiffs advance nine separate claims of error. First, did the trial court err in striking various portions of plaintiffs' amended complaint. Next, whether the jury's verdicts on Dr. Kitt's administration of cardiac massage and medication were against the manifest weight of the evidence. Also, whether the trial court incorrectly sustained objections to plaintiffs' closing argument. The remainder of the allegations of error concern the propriety of expert testimony: whether defendants' expert was improperly allowed to testify concerning certain medical texts; whether the trial court erred in refusing to strike certain expert testimony, as well as admitting Dr. Rubenstein's testimony on a pathology report he did not prepare. Finally, we are asked to address whether plaintiffs' expert was properly cross-examined with a medical treatise.

Count I of plaintiffs' pleading is comprised of some 15 subsections outlining defendants' alleged negligent acts or omissions. Seven of these claims plaintiffs withdrew voluntarily on their own motion. Thus, such issues were not addressed by the trial court. Nor shall we. An evaluation of the trial judge's directed verdicts on the remaining claims of negligence is our opening inquiry.

At the outset, the standard of review must be declared. In deciding whether to direct a verdict, a trial judge must view the evidence in a light most favorable to plaintiff's cause. In other words, if the evidence adduced so overwhelmingly favors the defendants that no contrary verdict could ever stand, the motion should be allowed. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) This does not mean, as plaintiffs imply, that defendants' burden is somehow increased. The trial judge must gauge whether the nonmoving party has produced some proof on each element vital to his cause of action. (Accord, *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 154.) If such party fails to do that, directing a verdict is proper.

Plaintiffs maintain Dr. Kitt performed the tonsillectomy in a careless, negligent manner, resulting in bodily injury to Mr. Alton. Even in the

absence of expert medical testimony indicating the level of care, plaintiffs assert, Dr. Kitt breached his duty of care to Mr. Alton. Plaintiffs declare that Dr. Kitt's conduct was so grossly defective, or that a tonsillectomy is so common a surgical operation that a layman would have no difficulty in appreciating the standard of care owed by an attending physician. Although we recognize some *dictum* supports this proposition (*Graham v. St. Luke's Hospital* (1964), 46 Ill. App. 2d 147, 158), we believe such a sweeping statement can only be understood within the purview of the facts of a given cause of action. *Hernandez v. Power Construction Co.* (1978), 73 Ill. 2d 90, 98-99.

The record contains no testimony, other than Dr. Kitt's, concerning the propriety of the surgical technique used to close the wound in Mr. Alton's throat after removal of his tonsils. The proposition was not discussed with Dr. Curtis, plaintiffs' expert. The record is without evidence which demonstrates the standard of care generally practiced in tonsillectomy cases. Dr. Rubenstein testified that three different methods (suture ligature, "free tie," and cauterization) were widely accepted techniques. He stated that personally, he preferred the "free tie" method, but did not testify such method was the one generally used in the medical community. Dr. Rubenstein had, on various occasions, used all three methods.

Failing to produce expert testimony critical of the standard of surgical technique employed by Dr. Kitt, plaintiffs did not show the breach of duty a physician owes to his patient. Nevertheless, plaintiffs contend such expert testimony was unnecessary since the requisite knowledge to understand the medical standard, and thus its breach, falls within the ken of the ordinary layman.

■■ Plaintiffs' notion concerning the absence of expert testimony requires more than we are willing to impute to the knowledge and experience of laymen to understand. In other words, the various surgical techniques (suture ligature (needle and catgut), "free tie," and electric cauterization) used to stop bleeding from an area where tissue is surgically removed are not within the common understanding of laymen. This is not a case where a sponge is left in a patient's abdomen following surgery. The question of how to terminate bleeding in a surgical area is a complex one involving many considerations, not to mention such as the situation at bar, where the patient is unconscious. Expert testimony is sorely needed. Only when it is present is the layman juror placed in a position to assess whether the duty resulting after the complications arose was in fact breached. *Taber v. Riordan* (1980), 83 Ill. App. 3d 900, 905-06.

The trial court struck the issue of whether Dr. Kitt was negligent in not informing Mr. Alton that bleeding complications arose after the initial surgery while the patient was still anesthetized. The plaintiffs have not

briefed the issue on appeal, although it is preserved. Again, as indicated previously, no testimony exists that a physician's failure to inform a patient of such complications was at variance with standard procedures employed by the medical community. Directing a verdict, then, was correct.

Plaintiffs alleged Dr. Kitt negligently discharged Mr. Alton without examining him and detecting bleeding. Purportedly, Dr. Kitt failed to consult medical records indicating that, when released from the hospital, Mr. Alton had been bleeding from the mouth. As to such error, the issue is not before us. Plaintiffs withdrew the issue, on their own motion, in the trial court.

Concerning the failure to examine, plaintiffs contend Mr. Alton was not examined on the day of release, that he was bleeding and in pain, but no medication was prescribed and no home care given. The trial court viewed these claims in a light most favorable to plaintiffs. Even so, a directed verdict was entered. Such was proper.

The fatal error with respect to this complaint was plaintiffs' failure to produce some evidence on not one, but two, components of the cause of action. Again, absent was testimony which established the prevailing medical practice of discharging a patient. Dr. Kitt testified what he recollected he did, but no proof was elicited from any expert medical witness that those discharge methods were not considered consistent with the standard practice in the medical community. Notwithstanding this deficiency, no evidence was produced whereby the post-operative injuries sustained by Mr. Alton were causally linked to any practice of Dr. Kitt in discharging him from St. John's Hospital (see *Burrow v. Widder* (1977), 52 Ill. App. 3d 1017, 1023). Merely because Mr. Alton began bleeding at home within two days of discharge is not evidence of negligence for releasing him originally.

The final two negligence claims concern Dr. Kitt's alleged failure to examine Mr. Alton prior to discharge and prescribe appropriate medication. Plaintiffs contend Dr. Rubenstein testified to certain customs and standards in the medical community. Then, they conclude, Dr. Kitt's conduct, because it deviated from such standards, adequately forms the question for the jury's resolution.

■■ The gap in plaintiffs' reasoning is that it makes a leap we cannot accept. Merely because Dr. Kitt's conduct was at variance with that which Dr. Rubenstein indicated to be the norm does not mean Dr. Kitt was negligent. Plaintiffs' lawyer never queried Dr. Rubenstein or any other expert as to whether Dr. Kitt's conduct deviated from acceptable medical standards. Lacking such an inquiry, the difference in Dr. Kitt's methods only shows that his course of conduct was different. Reasons may have existed for the difference. (*Stevenson v. Nauton* (1979), 71 Ill. App. 3d

831, 835.) What they were, if any, was not developed. Nonetheless, a difference in treatment, or a physician's opinion as to the appropriate medical procedure does not establish negligence.

■■ Plaintiffs argue the initial operation and attendant complications at the hospital, and the events at the Springfield Clinic on January 17, 1974, establish liability on a theory of *res ipsa loquitur*. The trial court directed verdicts on both issues. We agree with the trial court.

The doctrine of *res ipsa loquitur* permits the trier of fact to infer negligence if the plaintiff demonstrates: (1) the improbability of injury without negligence; (2) injury by the agency or instrument in defendant's control; and (3) that any resulting harm was not due to the plaintiff's voluntary act or omission. (*Spidle v. Steward* (1980), 79 Ill. 2d 1, 5-7.) Some evidence on all three conditions must be present or a plaintiff risks the calamity a directed verdict portends.

Dr. Rubenstein testified that post-operative bleeding occurs in a certain, albeit small, percentage of all tonsillectomies. He also stated that such bleeding occurs regardless of the diligence and caution of the attending surgeon. Finally, he said that such post-operative bleeding can occur up to four days after the tonsils are removed.

Plaintiffs' expert, Dr. Curtis, was never questioned about post-operative bleeding in Mr. Alton's throat. In fact, no medical witness was ever asked whether post-operative bleeding ordinarily occurs without negligence. Dr. Curtis' testimony was not critical of any of Dr. Kitt's post-operative procedures except the administration of Valium and Demerol at the clinic's offices. This latter issue, decided by the jury, was in defendants' favor. Thus, plaintiffs failed to establish that any injury due to bleeding was the probable consequence of the conduct of Dr. Kitt.

Concerning bleeding at the Alton home three days after the operation, we believe any liability based on *res ipsa loquitur* is patently without merit. As indicated above, post-operative bleeding can be expected in some tonsillectomies regardless of the caution of the physician. Next, Mr. Alton was not under the control of Dr. Kitt at the time the bleeding began, but was convalescing at home. Finally, Mr. Alton was not immobile, but quite capable of causing injury to himself which could be the proximate cause of bleeding.

The trial court directed verdicts in favor of the Springfield Clinic concerning its liability for punitive damages under plaintiffs' theory of *respondeat superior*. Since Dr. Kitt managed his patients, supervised several nurses, and was the only physician present in the specific medical department of the clinic on January 17, plaintiffs say, such is ample to confirm Dr. Kitt was acting as a manager in the scope of his employment. Under such circumstances an employer can be liable for the tortious conduct of an agent. (*Tolle v. Interstate Systems Truck Lines, Inc.* (1976),

42 Ill. App. 3d 771, 774, citing Restatement (Second) of Agency §217C (1958).) Plaintiffs correctly cite the rule, but confuse its application to this cause.

Dr. Rubenstein, a partner in the Springfield Clinic, testified Dr. Kitt was an employee of the firm. He stated Dr. Kitt was without management authority, and did not partake in management decision-making. Based on this, the trial court directed a verdict for defendants. This was error.

■■ Even if the question should have gone to the jury, the fact it did not does not amount to reversible error. The jury considered the punitive damage aspect of Dr. Kitt's conduct and found in his favor. As we will indicate later, the negligence verdicts for Dr. Kitt were proper. Since the gravamen of plaintiffs' charge was premised on Dr. Kitt's individual negligence, or as an employee of the clinic, the jury's exoneration of him precludes recovery against the clinic for compensatory or exemplary damages on the same cause(s) of action. This has been the rule in Illinois for at least 80 years (Anderson v. West Chicago Street R.R. Co. (1902), 200 Ill. 329, 336), and we adhere to it.

Mr. Alton's injuries were the result of either Dr. Kitt's administration of Valium and Demerol at the clinic's office, or the untimely complications subsequent to his fainting. The jury had those two issues before them, and decided them in favor of the defendants. Plaintiffs say such results are against the manifest weight of the evidence. We disagree.

Whether Dr. Kitt negligently administered medication prior to, and cardiac massage after, Mr. Alton became unconscious was contested by both sides. The series of events which led up to these occurrences produced the bulk of the trial testimony. Clearly, both events happened in a short period of time. In what sequence these episodes took place was critical; ultimately, the jury decided such facts.

When Mr. Alton began hemorrhaging, emergency treatment was required. Mrs. Alton left the room and sought aid. Upon arrival, Dr. Kitt began preparations to suture the wound site. In order to calm the patient, he injected him with Demerol. Otherwise, he testified, suturing would have been impossible. No other witness recalled Mr. Alton being over-wrought. Also, whether the suctioning machine to remove blood from Mr. Alton's throat was ever used was contested. It was entirely reasonable for the jury to conclude that in order to successfully close the wound, the injection of a pain-killer was necessary.

When suturing preparations were being made, and when Mrs. Ratliff returned with the proper sutures, Mr. Alton either fainted or went into respiratory arrest because of the effects of the drugs. Then, Dr. Kitt began cardiac massage. Blood pressure and pulse readings were taken. The exact sequence of events was disputed. As plaintiffs note, the issue

became, if Dr. Kitt commenced cardiac massage initially, whether this was negligent in view of the testimony that Mr. Alton was not breathing. Drs. Rubenstein and O'Malley testified that cardiac massage was consistent with attempting to save Mr. Alton's life. Plaintiffs' attorney never elicited any testimony from any medical witness that administration of external cardiac massage defied acceptable medical practices. Quite simply, the jury was persuaded by the defendants' version of what happened.

Concerning the administration of the drugs, plaintiffs' expert, Dr. Curtis, an eye, ear, nose and throat specialist, testified the injection of Demerol was contrary to acceptable medical practice. He testified that a patient who had undergone a marked decrease in blood pressure, like Mr. Alton, will go into respiratory arrest because of the effects of Demerol.

The defendants' expert, Dr. O'Malley, a medical specialist in neurology and pharmacology, believed Mr. Alton fainted. He completely rejected Dr. Curtis' theory since the 50-milligram dose of Demerol, he believed, was insufficient to cause respiratory arrest.

The jury chose to believe defendants' experts both on the question of cardiac massage and administration of drugs. Truly, as to the injection of medication, a "battle of experts" was fought. The defendants won because the jury believed Dr. O'Malley. The jury was made aware of the factors plaintiffs cite for rejecting Dr. Kitt's testimony. In the final analysis the issue becomes one of credibility, a jury determination. We see no reason to meddle with those verdicts, neither of which, was unreasonable or palpably erroneous.

Next, plaintiffs claim the trial court mistakenly denied their motion to strike certain testimony of Dr. O'Malley, defendants' expert. Because an adequate evidentiary foundation was lacking, plaintiffs argue, the witness' opinion as to whether the administration of Valium was consistent with acceptable medical standards was inadmissible.

This motion was overruled because it was not timely. It came when Dr. O'Malley was no longer on the witness stand, and after he expressed his views on the use of drugs, as well as the propriety of cardiac massage as emergency treatment. The record shows that plaintiffs' objection was not based on insufficient foundation, but whether Dr. O'Malley was familiar with the practice of medicine in Springfield, Illinois. Although we doubt such an objection has any substantive effect (*Holcomb v. Magee* (1920), 217 Ill. App. 272, 282), the deciding factor is that plaintiffs did not object when the character of the objectionable testimony became apparent (*Kelleher v. Chicago City Ry. Co.* (1912), 256 Ill. 454, 458). Plaintiffs were aware that Dr. O'Malley was not a practicing physician in Springfield. This was established when the witness was originally accredited on direct examination, if not before. Plaintiffs' objection should have been

made at that time. Because it was not, the trial court did not err in denying the plaintiffs' belated request, even if the basis for the motion had any substance.

■■ Plaintiffs also complain that Dr. O'Malley was allowed to testify from the Physicians Desk Reference, a medical text, in part or in lieu of his direct testimony. In brief, this is a hearsay objection. We believe the contention misplaced.

First of all, Dr. O'Malley indicated he was not only familiar with the text, but had written portions of it. The Physicians Desk Reference is a scientific amalgam of pharmacological information for the physician who administers various drugs or chemical agents. It is a medical compilation of facts and recommendations, edited yearly, which is widely used and recognized by the practicing medical community. It is, in a word, a trustworthy text. We believe a vigorous cross-examination would cure any objection to a medical expert's reference to it when testifying.

Secondly, in a recent decision which both parties cite in their briefs, our supreme court stated, " 'whether his [a physician's] source of information for that particular fact is in part or entirety the hearsay of his fellow practitioners and investigators is immaterial * * *.' " (*Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 557 (citing 3 Wigmore, Evidence §687, at 3 (1970).) Based on inherent trustworthiness of the Physicians Desk Reference as a medical text, as well as the guidance from the Illinois Supreme Court, plaintiffs' objections are meritless.

The next challenge is Dr. O'Malley's testimony that Mr. Alton's unconscious state was caused by fainting due to the sight of blood, not the administration of Valium, and later Demerol. Plaintiffs argue Mr. Alton's reaction was hypothetically analogized to that of a nurse who faints at the sight of blood, and thereafter what emergency treatment would be employed to revive her. Plaintiffs conclude that testimony on this nonsimilar situation was too general, and misled the jury as to the facts.

Although plaintiffs state the rule correctly (*Opp v. Pryor* (1920), 294 Ill. 538, 546), the facts do not trigger the rule's application. Dr. O'Malley's testimony, at this point, concerned his familiarity with situations where a person becomes unconscious. As a specialist in neurology, his experience with situations such as that of a nurse fainting, were important to accredit him in the eyes of the jury. Defendants were merely attempting to lay foundation for the witness' experience in dealing with unconscious persons or technically his familiarity with the neurology of a syncope episode (faint). When defendants subsequently posed the hypothetical question as to the witness' opinion as to the cause of Mr. Alton's unconsciousness, no objection was made. Since the witness was not rendering an opinion based on what a doctor should do to a person who

simply faints, a nonsimilar situation to that of Mr. Alton, this testimony was properly admitted into evidence.

When the trial court refused to strike testimony of Dr. Curtis, plaintiffs' expert, on cross-examination, the Altons say, the trial court erred. The gist of the objection is that an insufficient foundation was laid for use of the text.

■■ Although plaintiffs' objection may facially have some appeal, it was never lodged in the trial court. At the trial level, the objection was based on the fact that the medical text was not produced and shown to the plaintiffs. The fact of the text's credibility and that it was a standard treatise known to the medical community was never raised. Since the trial court had no opportunity to rule on such an objection, it has not been properly preserved for review, and is waived.

■■ Plaintiffs also claim error concerning Dr. Rubenstein's testimony about a pathology report. Allegedly, this record should have been stricken because Dr. Rubenstein did not prepare it. We disagree.

The record shows that initially, Dr. Rubenstein was called by the plaintiffs as an adverse witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60). He testified that he reviewed a pathology report prepared at St. John's Hospital by the hospital's pathologist concerning Mr. Alton's tonsils. Later, defense counsel questioned Dr. Rubenstein about the same report. Plaintiffs say that such testimony was hearsay and violates the long-standing Illinois rule against the admission of hospital records.

Technically, the pathologist's report was hearsay. The record establishes that plaintiffs originally questioned the witness on facts concerning the report. In short, the plaintiffs opened the very door for testimony they now claim should not have been allowed. This type of an objection might have force if plaintiffs had not solicited testimony about the report originally. Plaintiffs want the best of both worlds. We agree with the trial judge who was not prepared to honor such a request.

■■ The final error concerns final argument. Plaintiffs say the trial court erred in sustaining a defense objection to plaintiffs' argument which highlighted defendants' failure to adduce any evidence from among the clinic's own doctors.

Although a party may be allowed to comment on another party's failure to call a witness within the latter's power to produce, limits do exist as to such a party's failure to do so. This is especially true, where, as in the case at bar, plaintiffs tender no jury instructions which reveal to a jury that legitimate inferences can be drawn, in a civil trial, when such witnesses fail to testify. Moreover, Dr. Kitt and at least 26 other doctors working at the clinic were parties defendant. To parade all such persons as potential

witnesses would be a needless exercise. Under such circumstances, then, we do not believe the trial court abused its discretion in sustaining defendants' objection (cf. *Miller v. DeWitt* (1965), 59 Ill. App. 2d 38, 131-32).

We recognize in this case that plaintiff has suffered disabling injuries. The record, as well as the rulings of the trial judge, have been thoroughly perused. Admittedly, this trial was, at times, hostile. We believe the parties obtained a fair trial, although admittedly not a perfect one.

Finding the questioned trial court rulings and jury verdicts to be proper, we affirm the judgments of the Circuit Court of Sangamon County.

Affirmed.

SCOTT, J., concurs.

JUSTICE BARRY, specially concurring:

This is the sort of case which, at first glance, would seem to call for a remand for a new trial. Plaintiff has suffered tragic consequences from a relatively simple surgical procedure—the removal of his tonsils. However, I must concur with the majority.

A careful review of the record reveals that there was sufficient evidence to support the jury's verdicts. The law of Illinois is clear that the testimony of one doctor that he would have followed a different course of treatment is not sufficient to establish Dr. Kitt's negligence as a matter of law. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 380 N.E.2d 801.) The plaintiff's evidence was so limited; testimony of the medical experts and of the eyewitnesses was merely contradictory and unclear—thus creating credibility issues. The jury obviously concluded that plaintiff was the victim of an unusual medical accident, complicated by plaintiff's unexpected loss of consciousness, and that Dr. Kitt and those assisting him undertook appropriate life-saving procedures in a proper manner under the circumstances. As a reviewing court, we cannot substitute our judgment for that of the trier of fact.

Although I concur in my colleagues' decision to affirm the judgment in this case, I do not agree with all of the majority opinion. I disagree with the statement that the trial court erred in directing verdicts in favor of the Springfield Clinic as to its liability for punitive damages under plaintiffs' theory of *respondeat superior*.

The law of Illinois permits an award of punitive damages against a master or other principal because of an act by an agent where the agent was employed in a managerial capacity and was acting in the scope of employment, or in certain other circumstances which are not involved

here. (See Restatement (Second) of Agency §217C (1958).) The rationale supporting vicarious liability for punitive damages in such cases rests primarily upon the deterrent effect to the corporate master, and, therefore, some complicity on the part of the master must be demonstrated such as when the superior officer orders, participates in, or ratifies outrageous conduct. (*Tolle v. Interstate Systems Truck Lines, Inc.* (1976), 42 Ill. App. 3d 771, 356 N.E.2d 625.) Most noteworthy are two Illinois cases, each involving an action against a bus driver and the company which employed him. The supreme court adopted the Restatement requirements for vicarious liability for punitive damages in *Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 330 N.E.2d 509. (Accord, *Oakview New Lenox School District No. 122 v. Ford Motor Co.* (1978), 61 Ill. App. 3d 194, 378 N.E.2d 544.) In both cases, the employer was held not liable for the negligent conduct of its employee.

Here the evidence did indicate that Dr. Kitt gave orders and supervised certain employees, but his managerial functions related solely to the scheduling of his appointments and the management of the medical care of his own patients. The testimony of Dr. Rubenstein was uncontradicted that Dr. Kitt was an employee of the clinic; that he supervised only those other employees who assisted him; that Dr. Kitt did not participate in any decisions relating to the management of the clinic; that Dr. Kitt had been employed about 6 months earlier to work with Dr. Rubenstein, who was the managing partner for the ear, nose and throat department; and that even in Dr. Rubenstein's absence, Dr. Kitt did not occupy a management position. I believe this evidence required the trial court to enter directed verdicts in favor of the clinic.

Further, while the plaintiffs' counsel's examination of Dr. Kitt under section 60 was forceful and antagonistic, I do not agree with the majority's statement that the atmosphere in the trial court was hostile to either party in general. Rather, my reading of the record indicates that, while the trial was hotly contested with all parties vigorously asserting their views, nevertheless the trial was conducted in a manner fair to all parties.

I concur.