MICHAEL D. HARRINGTON, Indiv. and as the Special Adm'r of the Estate of Sheryl Colburn Harrington, Deceased, Plaintiff-Appellee, v. RUSH-PRESBYTERIAN-ST. LUKE'S HOSPITAL, Defendant-Appellant.

First District (4th Division)   No. 1—89—1254

Opinion filed December 20, 1990.—Rehearing denied April 2, 1991.

---

Lord, Bissell & Brook, of Chicago (William C. Anderson, Harold L. Jacobson, and Hugh C. Griffin, of counsel), for appellant.

Hayes & Power, of Chicago (Joseph A. Power, Jr., and David A. Novoselsky, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Defendant Rush-Presbyterian-St. Luke's Hospital (Rush) brings this appeal seeking reversal of a jury verdict rendered in favor of plaintiff Michael Harrington. Harrington's medical malpractice action alleges that Rush was negligent in the care and treatment of Sheryl Harrington, Michael's wife, and that such negligence proximately resulted in Sheryl's death. After a full trial on the merits of Harrington's claims, the jury returned a verdict in Harrington's favor and against Rush.

Rush now brings this appeal, claiming: (1) the trial court erred in not granting Rush's motion for a directed verdict and/or Rush's motion for judgment *n.o.v.*; and (2) erroneous evidentiary rulings, improper jury instructions and plaintiff's prejudicial closing argument entitle Rush to a new trial.

For the reasons set forth below, we affirm.

BACKGROUND

Sheryl and Michael Harrington were married in 1975. Shortly before their marriage, Sheryl was involved in a serious automobile accident that resulted in the amputation of her right leg below the knee. In 1976, Sheryl and Michael had a son, Ryan.

The leg amputation left Sheryl with chronic pain in her right leg stump and serious mental depression. Sheryl was under the treatment of several physicians for problems relating to the leg amputation. Sheryl was prescribed Darvocet, a mild pain killer. Sheryl thereafter became dependent on Darvocet.

In 1977, Sheryl and Michael decided to have another child. Before attempting to do so, Sheryl wanted to terminate her dependency on Darvocet. Sheryl's physician advised her to undergo in-patient treatment to relieve her of any dependency on Darvocet. Sheryl's physician indicated that the in-patient detoxification program would last approximately three weeks. Sheryl decided to voluntarily admit herself into Rush for the purpose of undergoing an in-patient detoxification program.

Sheryl was admitted to Rush on October 24, 1977. On October 25 and 26, Sheryl's visitors noticed that she appeared to be groggy. On October 28, her condition improved and she became more alert. Sheryl's poor condition was attributed to the detoxification program.

On October 29, 1977, Sheryl's condition appeared to worsen. She was constantly falling asleep and could not carry on a conversation. On October 30, 1977, Sheryl suffered from severe headaches and appeared to be totally incoherent.

On October 31, 1977, Sheryl remained groggy. The last time a member of Sheryl's family saw her alive was at approximately 9 p.m. on October 31, 1977. Sheryl was pronounced dead on November 1, 1977.

The autopsy report indicated that Sheryl had died from "combined drug toxicity" as a result of her system being overloaded with various drugs, most notably, Darvocet.

Michael thereafter commenced this action against Rush claiming that Rush's failure to monitor and care for Sheryl had proximately caused Sheryl's death.

The case against Rush was premised on Rush's failure to properly monitor Sheryl during the night of October 31, 1977, and the morning of November 1, 1977.

Near 11 p.m. on October 31, 1977, Sheryl passed out on the bathroom floor. The nurses returned Sheryl to her bed but did not contact a physician regarding Sheryl's episode. There were no progress notes of Sheryl's condition from 11 p.m. to 7 a.m. and no mention was made in Sheryl's records of her collapse. In addition, the record reveals that following Sheryl's collapse, Rush's nurses failed to check on Sheryl's condition for the remainder of the evening of October 31-November 1, 1977. The evidence also showed that Rush's nursing staff failed to give Sheryl her medicine at 1 a.m. and 5 a.m. Sheryl's autopsy indicated that she had died some four to six hours before 7 a.m. on November 1, 1977.

The evidence at trial showed that Narcon is an antidote for Darvocet. It immediately reverses the effects of Darvocet. There was expert testimony presented that if Narcon had been given to Sheryl, she would be alive.

Both Rush and the plaintiff presented expert testimony regarding the standard of care owed by a hospital's nursing staff. The plaintiff's experts testified that Rush's failure to give Sheryl her medicine at the prescribed intervals as well as Rush's failure to check Sheryl on a regular basis constituted a breach of the standard of care. In addition, the plaintiff's expert testified that Sheryl's life could have been saved had Rush's nurses identified her condition and provided her with Narcon. The plaintiff's experts interpreted the absence of entries on Sheryl's medical charts as indicating that nothing had been done for Sheryl during the night.

Rush's experts, on the other hand, opined that the mere absence of entries did not reflect that regular checks on Sheryl had not been made. Rush's experts also asserted that Sheryl's drug toxicity level was so high that she could not have been saved even if her condition had been discovered by Rush's nurses. According to Rush's experts, therefore, no breach of the standard of care occurred.

Following a trial of several weeks, and the presentation of many exhibits, the jury returned a verdict in favor of the plaintiff and against Rush in the amount of $4 million. That amount was subsequently reduced by prior settlements that other defendants had made with the plaintiff.

Rush's post-trial motions were denied, prompting Rush to bring this appeal.

OPINION

Rush asserts two principle arguments in seeking reversal of the jury's verdict.

First, Rush claims that it was entitled to a directed verdict or, in the alternative, a judgment *n.o.v.* Rush asserts that the evidence was insufficient to prove a breach of the standard of care by Rush's nurses and that the plaintiff did not meet its burden of establishing that any additional monitoring by Rush's nurses would have prevented Sheryl's death.

The standard governing directed verdicts and judgment *n.o.v.* was set forth by the supreme court in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504. The celebrated *"Pedrick* standard" provides:

> "[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." 37 Ill. 2d at 510, 229 N.E.2d at 513-14.

Applying that standard to the case at bar, we believe the trial court correctly denied Rush's motion for a directed verdict as well as its motion for judgment *n.o.v.* There is no dispute that Rush had a duty to monitor Sheryl's vital signs, to observe Sheryl's breathing patterns on a periodic basis during the night, and to advise Sheryl's physician of any significant changes. Rather, the dispute centered around whether Rush had in fact performed its monitoring obligations.

The plaintiff presented medical evidence that showed Rush had not checked on Sheryl's condition for at least six or seven hours. The plaintiff's expert testified that rigor mortis had set in between 3 a.m. and 4 a.m. and that any type of inspection by Rush's nurses would have revealed Sheryl's condition. Also, there was no dispute that Rush's nurses failed to give Sheryl her medicine at 1 a.m. and 5 a.m. on the morning in question.

Furthermore, the evidence shows that Sheryl collapsed at approximately 11 p.m. and was helped back into bed by Rush's nurses. However, the nurses failed to notify Sheryl's physician of that episode.

The plaintiff thus presented evidence from which a jury could find that Rush breached the standard of care by failing to monitor Sheryl's condition and by failing to inform Sheryl's physician of her collapse. This evidence, when viewed in a light most favorable to the plaintiff, is clearly sufficient to withstand scrutiny under the *Pedrick* standard.

Rush also claims that, even if its nurses failed to monitor Sheryl, nevertheless, Rush's failure was not the proximate cause of Sheryl's death because there was nothing that could be done to save Sheryl's life.

This was a hotly contested issue at trial. Each side's expert witnesses opined regarding whether "prompt intervention" could have saved Sheryl's life. Needless to say, the plaintiff's experts contended that Sheryl's life could have been spared and Rush's experts testified that no help would have been sufficient.

There is no dispute, however, that Narcon was an antidote that could have been utilized to counter the effects of Sheryl's toxicity. The plaintiff's expert specifically testified that, to a degree of medical and scientific certainty, Sheryl's life could have been saved if the Narcon had been administered at 11 p.m. following her collapse. Although Rush's expert testified that Sheryl's death was "sudden" and that no amount of monitoring could have saved her, this difference of opinion between experts was clearly a credibility issue that the jury resolved in the plaintiff's favor.

The plaintiff thus presented sufficient evidence from which a jury could find that Sheryl's death was proximately caused by Rush's negligence. Under these circumstances, we cannot overturn the jury's verdict pursuant to the *Pedrick* standards.

In sum, the issues of negligence and proximate cause were matters that were properly left for the jury to decide. We cannot say that the evidence "so overwhelmingly favors [Rush] that no contrary verdict" could ever stand. (*Pedrick*, 37 Ill. 2d at 510, 220 N.E.2d at 513-14.) We therefore affirm the trial court's orders denying Rush's motion for a directed verdict and its motion for a judgment *n.o.v.*

Rush's second basis for reversal attacks procedural rather than evidentiary matters. Rush asserts that the trial court erred in permitting one of the plaintiff's expert witnesses to render certain testimony, that Rush was denied a fair trial because of improper jury instructions, and that plaintiff's closing argument was unfairly prejudicial.

■ Initially, we do not believe that the trial court abused its discretion in permitting the plaintiff's nursing expert to render testimony regarding the effects of certain medicines. The trial court inquired as to the expert's qualifications, and the trial court could have found, within its discretion, that the nursing expert's experience and background were adequate to permit her to render her opinion. See *Broussard v. Huffman Manufacturing Co.* (1982), 108 Ill. App. 3d 356, 438 N.E.2d 1217.

■ Rush also asserts that the trial court erred in giving both the "ordinary negligence" instructions and the "medical malpractice" jury instructions. We agree with Rush that both instructions should not be given in a medical malpractice case. However, Rush failed to

submit a modified set of jury instructions and, therefore, waived any complaint regarding the instructions tendered by the trial court.

■■ Finally, Rush complains about plaintiff's closing argument. Interestingly, the focus of this dispute relates to the failure to call the nurses who were on duty on the evening of October 31-November 1, 1977, to testify. Plaintiff's counsel asserted that he did not call the nurses because he believed Rush's counsel was going to do so. Rush's attorney, on the other hand, also did not call the nurses to testify. For some reason, therefore, neither side called the very persons whose conduct, it appears, was at issue in this trial.

Whatever the reason for this strategy, we have closely reviewed the record and reject Rush's contention that it was denied a fair trial because of comments made by plaintiff's counsel during closing arguments. The comments directed to the testimony or nontestimony of the nurses were certainly a disputed issue and one that could not possibly have interfered with Rush receiving a fair trial.

Accordingly, for all the reasons set forth above, we affirm the jury's verdict.

Affirmed.

McMORROW, P.J., and JIGANTI, J., concur.