DAISY EAGLIN, as Special Adm'x of the Estate of Carrie Dunklin, Deceased, Plaintiff-Appellee, v. COOK COUNTY HOSPITAL et al., Defendants-Appellants.

First District (5th Division) No. 1—90—1581

Opinion filed March 20, 1992.

Jack O'Malley, State's Attorney, of Chicago (Joan S. Cherry, Frank Oles, and Maureen D. Yamashiro, Assistant State's Attorneys, of counsel), for appellants.

Donald A. Shapiro, Ltd., of Chicago (Donald A. Shapiro and David A. Statham, of counsel), for appellee.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

This is a wrongful death action brought by plaintiff Daisy Eaglin, as administratrix of the estate of her sister, Carrie Dunklin, against defendants Cook County Hospital and Cook County Board of Commis-

sioners, alleging medical malpractice. The jury returned a verdict for plaintiff and awarded damages in the amount of $1.5 million upon which the court entered judgment. The issues raised by defendants on appeal are: (1) whether the trial court erred in giving the jury Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971) (IPI Civil 2d No. 5.01); (2) whether plaintiff's counsel improperly stated in his closing argument that the jurors could draw a negative inference from defendants' failure to provide doctors' orders and produce other unidentified nurses; (3) whether the trial court erred in submitting a general, as opposed to an itemized, verdict form; (4) whether the jury was improperly instructed regarding the measure by which to award damages and the factors that could be considered; and (5) whether the award of damages in the amount of $1.5 million is excessive and unsupported by the evidence presented at trial.

In 1981, 27-year-old Carrie Dunklin contracted systematic lupus erythematosus (lupus), an incurable but treatable rheumatical disease, while doing missionary work in Haiti. Upon returning to the United States to receive treatment of her lupus, Carrie was admitted to Cook County Hospital. At the time, Carrie was suffering from anemia, thrombocytopenia malar rash, and alopecia. Carrie remained at the hospital for over two months where she underwent surgery for a lesion on her left thigh and was given the medication prednisone, a highly potent steroid medication, of which psychosis is a recognized side effect. In December 1981, after a flare-up of her lupus, her dose of prednisone was increased. During this admission she became catatonic, refusing to talk or eat, and began having paranoid thoughts. Carrie was discharged from Cook County Hospital in February 1982, after her symptoms were controlled and her prednisone dosage was decreased.

From February to June 1982, while Carrie recuperated at her sister's home, she remained on a low level of prednisone. On June 19, 1982, Carrie was again admitted to Cook County Hospital after developing an abscess on her leg and her prednisone medication was increased. Upon stabilization she was released to her sister's care. On June 29, 1982, Carrie overdosed by taking 50 prednisone tablets at once and was rushed to Little Company of Mary Hospital, where her stomach was pumped. Carrie told the hospital social worker that she had not intended to commit suicide when she took the excess medication. Later that day, Carrie was transferred and admitted to Cook County Hospital due to her ongoing treatment at that hospital.

Upon arrival in the Cook County emergency room, Carrie was examined by Dr. Davila, an intern in internal medicine. Carrie was pre-

scribed a treatment plan which included 40 milligrams per day of prednisone. Dr. Davila made a differential diagnosis of (1) abnormal mental status secondary to lupus central nervous system involvement or (2) secondary depression of prednisone overdose. At the time of Carrie's admission to Cook County Hospital, the hospital had written protocols for dealing with suicidal patients. The protocol required that "the physician write orders for 'suicidal precautions' on the order sheet and elaborate on the patient's condition in progress notes." Despite the fact that Dr. Davila recalled placing Carrie on suicide precautions which included one-to-one nursing or continual observation of the patient, the hospital chart revealed no orders for suicide precautions. She was placed on ward 35, which provided maximum nursing attention, and the nursing written orders note the use of bed rails and the possibility of restraints if necessary. In an interview with resident Dr. Gogna, Carrie said that she had not tried to commit suicide. Dr. Gogna suspected that Carrie was suffering an adverse reaction to her prednisone medication. Moreover, Dr. Peter Orris, Carrie's attending physician, examined her on June 30, 1982, and concluded that Carrie suffered from lupus with depression and her depression was either caused by the prednisone or the lupus itself.

On June 30, 1982, Carrie was given a psychiatric evaluation by Nurse Evangeline Basa, a member of a psychiatric consultation team. Although Nurse Basa did not testify at trial, the record reveals that after meeting with Carrie, Basa drafted a report stating her impression that Carrie was psychiatrically stable and not suicidal. Carrie told Basa that she was not willing to receive any psychiatric intervention or counseling. Nurse Basa recommended that Carrie be motivated to have psychiatric out-patient follow-up and that there be monitoring of the patient's behavior and moods. Dr. Orris testified that after receiving the psychiatric team's assessment, he concluded that Carrie no longer needed suicide precautions. Therefore, Carrie was transferred to ward 65, which was less open for patient observation than ward 35. Carrie was placed on the sixth floor of the hospital with unrestricted access to an unlocked and unguarded fire escape balcony which was used by the patients to go out on and smoke cigarettes.

Resident Bruce Bernard, assigned to care for Carrie on July 1, testified that Carrie initially informed him that she was depressed because she had lupus and newly open wounds. She further expressed depression over the fact that she had to rely on her sister and could not work. Dr. Bernard observed that from July 1 to July 4, 1982, Carrie showed a clinical improvement and it appeared that her depression

was lifting. However, on July 4, Carrie jumped from the sixth-floor fire escape balcony to her death.

On June 29, 1983, plaintiff, Daisy Eaglin, filed a wrongful death medical malpractice suit against Cook County Hospital, the Cook County Board of Commissioners, Dr. Orris, Dr. Gogna, Dr. Davila, Dr. Bernard and Nurse Basa. Plaintiff brought this suit on behalf of Carrie's mother, Pearlie Dunklin, and Carrie's 12 brothers and sisters. Plaintiff alleged in her third amended complaint that defendants:

"(a) Failed to properly evaluate Carrie Dunklin for continued suicide risk;

(b) Failed to take appropriate measures to protect Carrie Dunklin against further suicide attempts;

(c) Negligently placed Carrie Dunklin on a floor of the hospital with unrestricted access to an unlocked fire escape balcony;

(d) Failed to properly treat Carrie Dunklin for her suicidal condition and depressive mood disorder; [and]

(e) Failed to follow and enforce its own protocol for treatment and care of patients at increased risk for suicide."

It was stipulated by the parties prior to trial that plaintiff would voluntarily dismiss all individual defendants on the condition that these individuals would be available as adverse witnesses in plaintiff's case in chief against the hospital and the Board of Commissioners. The jury awarded plaintiff $1.5 million and defendants appealed.

Defendants first contend that the trial court erred in giving the jury plaintiff's tendered IPI Civil 2d No. 5.01, which instructed the jury that an adverse inference could be drawn from defendants' failure to present the testimony of Nurse Evangeline Basa. This instruction permits a jury to draw an adverse inference from a party's failure to offer evidence or to produce a witness within his power to produce when: (1) the evidence or witness was under the control of the party and could have been produced by the exercise of reasonable diligence; (2) the evidence or witness was not equally available to the adverse party; (3) a reasonably prudent person under the same or similar circumstances would have offered the evidence or produced the witness if he believed the testimony to be in his favor; and (4) no reasonable excuse for the failure has been shown. This instruction is given if the trial court determines that a party would in all likelihood produce the witness or other evidence unless the witness or evidence was unfavorable to that party. (*Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.* (1991), 217 Ill. App. 3d 94, 576 N.E.2d 918.) Whether to give this instruction is a decision within the sound discre-

tion of the trial court and is subject to reversal only when a clear abuse of discretion appears on the record. *Roeseke v. Pryor* (1987), 152 Ill. App. 3d 771, 504 N.E.2d 927; *Tuttle v. Fruehauf Division of Fruehauf Corp.* (1984), 122 Ill. App. 3d 835, 462 N.E.2d 645.

■ Defendants maintain that Nurse Basa was not within their control at the time of trial because prior to trial she had resigned from Cook County Hospital. In support of this argument, defendants cite *Wood v. Mobil Chemical Co.* (1977), 50 Ill. App. 3d 465, 365 N.E.2d 1087, wherein the court, although affirming the judgment in favor of the plaintiff, found that it was error for the trial court to tender IPI Civil 2d No. 5.01 to the jury since there was no evidence that at the time of trial the nurse was still employed by defendant. We, however, are more persuaded by the decision in *Tonarelli v. Gibbons* (1984), 121 Ill. App. 3d 1042, 460 N.E.2d 464, wherein a wrongful death action was brought against a railroad company and the train fireman, Lee Horst, who rode in the engine car at the time of the accident. Horst was the only witness to the accident alive at the time of trial. At the close of the plaintiff's case, defendant's motion for a directed verdict in favor of Horst was granted. In holding that the trial court did not abuse its discretion in giving IPI Civil 2d No. 5.01 as to the railroad company's failure to call Horst as a witness, the court stated:

> "The defendant contends on appeal that Horst, who lives in Colorado, was not within his control. However, the record indicates that defense counsel told the trial court and the plaintiff's attorney while discussing a motion *in limine* that the defendant would call Horst to testify at trial. Additionally, the defense attorney told the jury in the opening statement that the evidence would show that prior to the collision, the flashing lights, a horn or whistle, and a bell were properly working, and that a southbound driver's view was completely unobstructed. Ostensibly, the defense had planned to call Horst, the only living eyewitness, to testify to these matters. Moreover, counsel for the defense represented Horst at the opening of the trial and obtained a directed verdict in his favor at the close of plaintiff's case. It is apparent that Horst was accessible to the defendant. If Horst had become unavailable subsequent to defense counsel's indications that he would testify, defense counsel had the right to explain that to the jury; however, no attempt to do so was made. [Citation.] Since the defendant did not call Horst, there is a presumption that his testimony would have been adverse to the defendant.

> Although the presumption does not apply if the witness was equally available to either party, a witness is not considered equally available to a party, if there is a likelihood that he would be biased against that party. [Citations.] In the instant case, Horst had been sued by the plaintiff and had spent several years defending himself. In addition, he had been employed by the defendant for more than six years. Under these circumstances, there is a likelihood that Horst would have been biased against the plaintiff. We cannot say that Horst was equally available to the plaintiff and the defendant." (*Tonarelli*, 121 Ill. App. 3d at 1047-48, 460 N.E.2d at 468.)

While Horst was living in Colorado at the time of trial, it is unclear from the case whether he was still employed by the railroad company at the time of trial.

Nonetheless, based on the particular facts in the instant case, we do not find the fact that Basa is no longer employed by the hospital to be dispositive. Nurse Basa was an employee of Cook County Hospital for at least 16 years and was a defendant in this case for six years. Throughout the six years of litigation, she was represented by the same lawyers representing Cook County Hospital. In fact, Nurse Basa remained a defendant until the start of trial, when plaintiff agreed to dismiss the individual defendants, including Basa, upon defense counsel's guarantee that each defendant would be made available to be called as adverse witnesses in plaintiff's case in chief. The fact that Basa was still under the control of defendants, even though she was no longer employed by Cook County Hospital, is evident from the fact that defense counsel at the start of trial was confident that he could produce Nurse Basa at trial. Accordingly, since Nurse Basa was a defendant and a former employee of Cook County Hospital, there is a strong likelihood that Basa would be biased against plaintiff and cannot be considered equally available to plaintiff.

In addition to assuring that Nurse Basa would be produced as an adverse witness, defense counsel made the following representation in his opening statement to the jury regarding his intention to call Nurse Basa as a witness:

> "You're going to hear it from a psychiatric nurse at Cook County Hospital who was—who is not just another nurse, who kind of took general care of patients, but a psychiatric nurse who had a background of substantial training and who had long experience in the area of psychiatric nursing. That psychiatric nurse didn't independently make any decision about Carrie Dunklin. She was part of a psychiatric team ***. *** [T]hat

team made the decision from the evidence, from the observations of Nurse Basa who had been making those observations for—since approximately 1973 as a psychiatric nurse at Cook County Hospital. And whose observations the psychiatric team had found over that period of time to be accurate and to be reasonable and to be reliable in terms of patients at Cook County Hospital who are looked at or spoken to about psychiatric problems."

Defense counsel explained to the jury the significance of Nurse Basa's testimony, but after they were suddenly unable to produce Nurse Basa at trial, they made no attempt to explain to the jury the reason for Nurse Basa's unavailability. While defense counsel explained that Nurse Basa had moved out of State and would not return his phone calls, defense counsel made this representation outside of the jury's presence. Under the specific circumstances of this case, we find that despite Nurse Basa's resignation from Cook County Hospital, she was still under defendant's control at the time of trial and no reasonable excuse was given for her failure to testify. Accordingly, the trial court properly determined that defendants would have produced Nurse Basa unless her testimony was unfavorable to defendants.

We also find no merit to defendants' contention that IPI Civil 2d No. 5.01 was not appropriate in this case since the testimony of Nurse Basa was merely cumulative in light of the fact that the court admitted all of Nurse Basa's records into evidence. This argument fails because a major part of plaintiff's case against defendants was that critical information was missing or not recorded in the medical records, including two alleged meetings that Nurse Basa had with other members of the psychiatric team in which Carrie was discussed. Defendants cite *Alton v. Kitt* (1982), 103 Ill. App. 3d 387, 431 N.E.2d 417, wherein the plaintiffs brought a medical malpractice action against 26 defendants for injuries arising from several surgical procedures. The appellate court in *Kitt* upheld the trial court's ruling prohibiting the plaintiff from arguing that an adverse inference could be drawn from defendant's failure to present all 26 defendants at trial. The court stated that "[t]o parade all such persons as potential witnesses would be a needless exercise." (*Alton*, 103 Ill. App. 3d at 399-400, 431 N.E.2d at 426.) While defendants argue that it would be a needless exercise to parade before the court all past and present Cook County employees who may have encountered Carrie at Cook County Hospital, requiring the testimony of Nurse Basa, the only nurse on the psychiatric team to evaluate Carrie, is a far cry from requiring 26 defendants to appear in court. Because Nurse Basa was the only per-

son from the psychiatric team who allegedly evaluated Carrie and defense counsel boasted that this evaluation was done by the exceptionally well-qualified nurse, her testimony was critical.

■■ Next, defendants contend that the following portion of plaintiff's closing argument deprived the county of a fair trial:

"How do we know it didn't happen the way Cook County Hospital says it happened? Well, No. 1, there were no physician's orders in the chart either putting Carrie Dunklin on suicide precautions or taking her off suicide precautions. There were other doctors' orders in the chart. You heard the testimony by all of the experts that orders are required by the Joint Commission to be in writing and that it requires patients charts to be preserved, and they preserved everything else in the chart except for those so called orders. These orders were made, were [sic] are they?

The court is going to instruct you, I believe, that when evidence is within the exclusive control of one of the parties, and that evidence is not produced in court, then you may draw an inference that that evidence would have been unfavorable to the party that failed to produce it. So the court is going to instruct you as a matter of law that when they failed to produce evidence that is within their exclusive control that you can draw an adverse inference from that."

Soon thereafter, plaintiff's counsel stated:

"Anyway, going back to Nurse Basa, where was she and why didn't Cook County Hospital produce her at this trial? I tell you why, because once again, just like the other nurses, they failed to produce, her testimony would not have been able to support the claim that a conscious decision was made to eliminate suicide precautions. In fact, as I mentioned, and the Court will instruct you about a witness that is under control of one of the parties that is not produced in the Court, and that applies to Nurse Basa and it also applies to the other nurses that Cook County Hospital did not call at trial."

Because defendants raised no objection to these comments during plaintiff's closing argument, any error is waived on appeal. (*Jamison v. Lambke* (1974), 21 Ill. App. 3d 629, 316 N.E 2d 93.) In any event, defendants could not prevail on this argument. During closing argument, counsel is given wide latitude to draw reasonable inferences and conclusions from the evidence. (*Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 492 N.E.2d 1364.) The scope of closing argument is within the sound discretion of the trial court and the

reviewing court will reverse only if the argument is prejudicial. (*Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 398 N.E.2d 188.) The standard governing the allowance of adverse comment in argument is the same standard that governs the use of IPI Civil 2d No. 5.01. (*Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 22, 541 N.E.2d 643.) Applying that standard, we reach the conclusion that no error was committed. Dr. Davila testified that he ordered suicide precautions for Carrie but conceded that his orders were missing from the hospital records. Moreover, while Dr. Orris testified that he reevaluated Carrie on June 30, and consciously ordered the suicide precautions lifted, the record is devoid of evidence substantiating Dr. Orris' testimony. In *Laport v. Lake Michigan Management* (1991), 252 Ill. App. 3d 221, the court concluded that defendant offered a reasonable excuse for its failure to produce inspection reports. According to company policy, the inspection reports were retained for two years. Thus the reports at issue would have been destroyed in the normal course of business before the suit was filed. The instant case is in sharp contrast. Here, absolutely no explanation was given as to the whereabouts of the suicide precautions written by Dr. Davila.

In addition, suicide precautions include one-to-one 24-hour monitoring by the nursing staff. However, not one nurse was called to testify that she had, in fact, provided one-to-one monitoring required by an order for suicide precautions. In *Harrington v. Rush-Presbyterian-St. Luke's Hospital* (1990), 210 Ill. App. 3d 183, 569 N.E.2d 15, the defendant also claimed that it had been prejudiced by plaintiff's comments in closing argument on the failure of nurses to testify. The focus of the dispute related to the failure to call the nurses who were on duty on the evening of decedent's death. Plaintiff's counsel asserted that he did not call the nurses because he believed defendant's counsel was going to do so, but defendant's counsel never called the nurses to testify. Therefore, neither side called the persons whose conduct was at issue in the trial. The court held that the comments directed to the testimony or nontestimony of the nurses were certainly a disputed issue and could not possibly have interfered with defendant receiving a fair trial. (*Harrington*, 210 Ill. App. 3d at 189, 569 N.E.2d at 19.) Here, too, we conclude that plaintiff's comments did not deny defendants a fair trial.

■ The next contention advanced by defendants is that the trial court erred when it approved the general verdict form tendered by plaintiff. Because defendants failed to object to the form of the verdict which was submitted to the jury or to tender an itemized verdict

form, they have waived this issue on appeal. (*Forrester v. Patrick* (1988), 167 Ill. App. 3d 105, 520 N.E.2d 1188; *Jeffers v. Weinger* (1985), 132 Ill. App. 3d 877, 477 N.E.2d 1270.) Likewise, because defendants failed to either object to the instruction that the jury could award all Carrie's siblings damages for loss of society or to offer an alternative instruction, defendants have also waived the right to appeal this issue.

■■ Defendants next contend that they were denied a fair trial because the jury was not instructed that it could have rejected the presumption of parents' substantial pecuniary loss. We disagree. Parents are generally entitled to a rebuttable presumption of substantial pecuniary loss. (*Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 499 N.E.2d 1373.) The presumption of substantial pecuniary loss of surviving parents of adult children is rebutted by evidence that the parent and child were estranged. (*Bullard v. Barnes* (1984), 102 Ill. 2d 505, 468 N.E.2d 1228.) Here, Pastor Ritchie described the relationship between Carrie and her mother as "close-knit." He testified that Carrie "would go check on" her mother and "would pay her utility bills or go buy groceries for her or do whatever her mother needed." In describing the relationship between Carrie and her mother, Daisy Eaglin said that "Carrie was the apple of my mother's eye" and that Carrie's relationship with her mother was further strengthened by their sharing devout religious beliefs. Pearlie Dunklin testified that Carrie visited her once a week, helped around the house, bought groceries for her and paid her utility bills. When Carrie left to do missionary work, Carrie and her mother wrote letters to each other once a week. Carrie also provided her mother with some limited financial assistance. Accordingly, this evidence served to buttress the presumption that Carrie's mother suffered substantial pecuniary loss upon Carrie's death. While defendants now contend that Carrie and her mother were estranged for the less than two-year period that Carrie resided in Chicago after returning from Haiti, no testimony was ever presented describing the relationship between Pearlie Dunklin and Carrie for such time period. In fact, defendants never offered an instruction on the rebuttable presumption or estrangement.

■■ We also reject defendants' contention that the jury award of $1.5 million is excessive. The amount of damages to be awarded in a wrongful death action is within the discretion of the jury and should not be overturned unless it is evidently the result of passion or prejudice, falls outside the limits of fair and reasonable compensation, or shocks the judicial conscience. (*Dotson v. Sears, Roebuck & Co.* (1987), 157 Ill. App. 3d 1036, 510 N.E.2d 1208.) In light of the relationship

Carrie had with her mother and her siblings, particularly Daisy, and the fact that this verdict is intended to compensate 14 individuals who suffered damages, we do not consider the $1.5 million verdict to be excessive.

Accordingly, for the reasons set forth above, the decision of the trial court is affirmed.

Affirmed.

LORENZ and GORDON, JJ., concur.