ALDISERT, Circuit Judge.
Tool Box, Inc., operator of a nude dancing establishment, appeals from a grant of summary judgment in favor of Ogden City Corporation, whose review board used an industrial park’s protective covenants to prevent the establishment from operating in an area zoned for sexually oriented businesses.
Nude dancing qualifies as expressive conduct that “falls within the outer ambit of the First Amendment’s protection.” City of Erie v. Pap’s A.M., 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion); Barnes v. Glen Theatre, Inc., 501 U.S. 560, 566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (“[N]ude dancing ... is expressive conduct within the outer perimeters of the First Amendment, though only ... marginally so.”).
This appeal requires us to decide whether a First Amendment prior restraint analysis applies here, and if so, whether procedures that permit government officials to prevent an establishment from operating in a permissible zoned area constituted prior restraint. We hold that the doctrine of prior restraint applies in favor of the Appellant, and accordingly, reverse the judgment of the district court.
This appeal concerns a federal question arising under 42 U.S.C. § 1983. Consequently, the district court had jurisdiction of the underlying action pursuant to 28 U.S.C. §§ 1331 and 1343. The appeal was timely under Rule 4, Federal Rules of Appellate Procedure. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.
I.
In 1976, Ogden City established its Ogden Commercial and Industrial Park on the western edge of town to create an “environment where manufacturing uses could develop and prosper.” App. at 26. To accommodate manufacturing interests *1172 and to provide for new development and expansion, Ogden City zoned the area “M-2” — a heavy industrial zone. The industrial park has since expanded progressively to the south and west of the original site.
Fourteen years later in 1990, Ogden City passed a Sexually-Oriented Business (“SOB”) zoning ordinance, designed to “establish reasonable and uniform regulations to prevent the concentration of sexually-oriented businesses or their location in areas deleterious to the community of Ogden, and to ... prevent inappropriate exposure to the community.” Ogden City, Utah, Ordinance § 15-13-13(A) (1990). Through a stated “time, place and manner” regulation, the SOB ordinance relegated such enterprises to very specific portions of the city- — among those the areas zoned M-2. Id. at § 15-13-13(C).
Aiming for further development of its industrial park and preservation of a “wholesome environment for the conduction of selective manufacturing and marketing enterprises,” Ogden City mapped out new plats in 1995 and entered into “protective covenants” restricting the use of land within the park. App. at 26. The covenants gave Ogden City a continued voice in how subsequent grantees could use the land. Indeed, Paragraph III of the Ogden Commercial and Industrial Park Protective Covenants set up a “special approval committee” known as the “Industrial Park Review Board” specifically to enforce the covenants. Id. The Mayor of Ogden City would appoint the committee’s three members, two of whom would be Ogden City employees and one of whom would be an industrial park land owner or her representative. Although the covenants provided that “Review Board decisions may be appealed to the Mayor, whose decision shall be final,” Id., the covenants offered no standards either for the Review Board’s evaluation of which businesses would gain development approval or for the Mayor’s review of an appealed committee determination. Neither the covenants nor the 1990 ordinance expressly bar SOBs from the M-2-zoned industrial park.
Jed Wilhite, who bought lot 112A from Ogden City pursuant to the 1995 protective covenants, leased the space to The Tool Box, Inc. (“Appellant”) on October 15, 1999. The lease agreement with Tool Box President Michelle Lutz noted that the enterprise would operate as an SOB, specifically as a nude dance club. On December 29, 1999, Appellant’s counsel sought assurance from the Ogden City Attorney that the covenants would not prohibit the SOB from operating in the Ogden City Commercial and Industrial Park. Five days later on January 3, 2000, the Ogden City Attorney confirmed in a reply letter that thfe covenants would “not constitute a bar to [Tool Box’s] proposed business.” Id. at 38. Based on this guarantee, Wil-hite and Lutz began construction on an specially designed adult entertainment facility.
Notwithstanding the Ogden City Attorney’s assurances, the Industrial Park Review Board informed Wilhite on April 20, 2000 that the committee rejected Wilhite and Tool Box’s site plan because “the proposed use [was] not ... in accordance with the operative Protective Covenants.” Id. at 39. The Review Board did approve the building’s architectural drawings and its aesthetic appearance. Id. at 40. The Review Board stayed the “issuance of a building permit ... pending resolution of this issue either by use change or final resolution of an appeal to the Mayor for final determination.” Id. at 39.
Wilhite, the owner of the land, appealed to Ogden City Mayor Matthew Godfrey. On May 19, 2000, Mayor Godfrey summarily affirmed the Review Board’s decision, “recognizing the discretion granted to *1173 the exercise of judgement [sic] by the Review Board under Article IX of the Protective Covenants.” Id. at 44.
A.
Tool Box filed suit under 42 U.S.C. § 1983 in the district court against Ogden City Corporation on June 1, 2000, seeking declaratory relief, injunctive relief, and damages resulting from the Review Board’s permit denial. On September 18, 2000, the district court denied Tool Box’s motion for a preliminary injunction that would have enjoined Ogden City from using protective covenants to prevent Tool Box from locating the business in the industrial park. Tool Box then filed a motion for partial summary judgment on the ground that the protective covenants, as applied by Ogden City to prevent Tool Box from establishing and operating a nude dancing business in the industrial park, constituted an unconstitutional prior restraint on Tool Box’s First Amendment rights. The district court denied the motion on March 5, 2001. Ogden City subsequently moved for summary judgment and dismissal for no cause of action. The district court granted Ogden City’s motion and dismissed Tool Box’s action on June 26, 2001. Tool Box filed a proper notice of appeal on July 5, 2001.
B.
Tool Box contends that the district court incorrectly eschewed a prior restraint analysis of the protective covenants in favor of the test set forth in United States v. O’Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), for regulations that are content-neutral but impact expression. Under the four-pronged test developed by the Court in O’Brien, the district court determined that the protective covenants were government regulations which: 1) fell within the government’s constitutional powers; 2) furthered “important or substantial government interest[s]”; 3) were unrelated to the suppression of free expression; and 4) were no greater than absolutely necessary to satisfy those interests. 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).
Tool Box argues that the O’Brien test was inappropriate for protective covenants that simply allowed Ogden City to prevent Tool Box from opening, without adequate procedural safeguards. It contends that the court should have used a prior restraint analysis to conclude that the protective covenants constituted an unlawful prior restraint because: 1) the covenants permitted city officials to use unbridled discretion in determining whether a nude dancing establishment could open in an area zoned specifically for such businesses; and 2) because the covenants lacked adequate procedural restraints.
II.
This Court reviews a district court order granting summary judgment de novo. Camfield v. City of Okla. City, 248 F.3d 1214, 1224 (10th Cir.2001). Summary judgment is proper when “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Rule 56(c), Federal Rules of Civil Procedure. “When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.” Camfield, 248 F.3d at 1224.
III.
At the outset, we must determine whether Tool Box has standing to challenge the protective covenants. Tool Box argues that it objects to how the protective covenants were applied — that Ogden City *1174 officials improperly exploited the covenants so as to grant unbridled discretion in the Review Board and the Mayor to determine whether the business could open. On its part, Ogden City contends that Tool Box mounts a facial challenge to the protective covenants and thus lacks standing because the Review Board and the Mayor may constitutionally apply the covenants.
A.
The Court subjects nebulous, overbroad regulation in the realm of protected expression to facial review, even though the regulation may be applied constitutionally in a certain scenario. Forsyth County v. Nationalist Movement, 505 U.S. 123, 129, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). A litigant has standing to challenge a licensing scheme “whether or not he applied for [permission to engage in protected speech].” Freedman v. Maryland, 380 U.S. 51, 56, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). “This exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court.” Forsyth County, 505 U.S. at 129, 112 S.Ct. 2395; see also New York v. Ferber, 458 U.S. 747, 772, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); Franken Equities, L.L.C. v. City of Evanston, 967 F.Supp. 1233, 1235 (D.Wyo.1997). Accordingly, a party may “challenge an ordinance ... in cases where every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker.” Forsyth County, 505 U.S. at 129, 112 S.Ct. 2395.
Although the Court has remarked that a “law of general application” should not be challenged until a party levies “an allegation of actual misuse,” City of Lakewood v. Plain Dealer Publ’g Co., 486 U.S. 750, 761, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), that restriction on the standing principle comes into play only when we confront those regulations that are “not aimed at conduct commonly associated with expression and [that] do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken.” Id. at 760-761, 108 S.Ct. 2138. If it were necessary for us to consider a facial challenge solely for the purpose of standing, we would have the axe fall on the side of standing, although conceding that the question is far from clear. But that necessity is not present here.
B.
Tool Box clearly has standing on the basis of the application of the protective covenants by the Review Board and the Mayor and Appellant’s interposition of a non-frivolous First Amendment argument.
The Ogden City Commercial and Industrial Park sits smack dab in the middle of an area that has been specifically zoned for sexually oriented businesses. The Review Board has unlimited discretion to determine which businesses may be built in the park. When the Review Board nixed Tool Box’s site plan, it did so only because “the proposed use [was] not ... in accordance with the operative Protective Covenants.” No standards were promulgated to guide the Board. Its discretion is absolute, limitless, boundless and measureless. This because-I-said-so approach is startlingly evident, as the record shows that the Review Board simultaneously authorized the building’s architectural drawings and its aesthetic appearance and denied the proffered use.
The Mayor is the government official to whom a denied applicant may appeal, and he has it in his power to use his “discretion” to defer to the decision of the Review *1175 Board. And he did precisely that in the case at bar.
Because a party may “challenge an ordinance ... in cases where every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker,” Forsyth County, 505 U.S. at 129, 112 S.Ct. 2395, Tool Box has standing to bring its claim against Ogden City. No guidelines were set forth to instruct both the property owner and the Review Board. In passing on the operation of the Tool Box business in the industrial park, the Review Board was not required to follow objective criteria in permitting or rejecting the intended us. And did not do so. The question then comes whether the procedure passes muster under the Constitution.
IV.
To state a cause of action under 42 U.S.C. § 1988 for an alleged violation of the Fourteenth Amendment and provisions of the Bill of Rights incorporated into the Fourteenth Amendment, “it is beyond cavil” that challenged conduct must constitute state action. Johnson v. Rodrigues (Orozco), 293 F.3d 1196, 1201 (10th Cir.2002); Lugar v. Edmondson Oil Co., 457 U.S. 922, 930-932, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). A proper claim must incorporate at least two elements, each a distinct inquiry: 1) the plaintiff must show that he has been deprived of a right protected by the Constitution and laws of the United States; and 2) the plaintiff must show that the putative state actor deprived him of the right while acting “under color of any statute” of the [municipality], Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). Given that Tool Box has alleged a deprivation of its First Amendment rights, we jump directly to the second inquiry — -that is, whether Tool Box has demonstrated that the Review Board acted under color of state law or, rather, engaged in state action.
Under the Court’s two-part framework for state action, we analyze: 1) “whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority”; and 2) “whether the private party charged with the deprivation could be described in all fairness as a state actor.” Lugar, 457 U.S. at 937, 102 S.Ct. 2744. As to the second, “[t]his may be because [the party] is a state official, because [it] has acted together with or has obtained significant aid from state officials, or because [its] conduct is otherwise chargeable to the State.” Id. The rationale undergirding this state action examination is to “preserve an area of individual freedom by limiting the reach of federal law and avoid the imposition of responsibility on a State for conduct that it could not control, but also to assure that constitutional standards are invoked when it can be said that the State is responsible for the specific conduct of which the plaintiff complains.” Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass’n, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (internal quotations and citations omitted) (emphasis in original). Accordingly, “the conduct allegedly causing the deprivation of a federal right” must be “fairly attributable to the State.” Lugar, 457 U.S. at 937, 102 S.Ct. 2744.
Taking a flexible approach to an inherently murky calculation, the Court progressively developed four different tests for courts to use in establishing precisely what might give rise to state action by an otherwise private party: 1) the public function test; 2) the nexus test; 3) the joint action test; and 4) the symbiotic relationship test. See Rodrigues (Orozco), 293 F.3d at 1202-1203 (reviewing comprehensively the Court’s longstanding tests for *1176 state action as impacted by Brentwood); Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir.1995) (offering an exhaustive discussion of the classic tests for state action).
Under the public function test, a court determines whether a private entity has exercised “powers traditionally exclusively reserved to the State.” Jackson v. Metro. Edison Co., 419 U.S. 345, 349, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Such powers have traditionally included the holding of elections, the performance of necessary municipal functions, or the running of a nursing facility. Rodrigues (Orozco), 293 F.3d at 1203.
Under the nexus test, a court considers whether “ ‘there is a sufficiently close nexus’ between the government and the challenged conduct such that the conduct ‘may be fairly treated as that of the State itself.’ ” Gallagher, 49 F.3d 1442, 1448 (10th Cir.1995) (quoting Jackson, 419 U.S. at 351, 95 S.Ct. 449). That is, “a state normally can be held responsible for a private decision ‘only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.’ ” Rodrigues (Orozco), 293 F.3d at 1203 (citing Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)).
Under the joint action test, state action exists if a private party is a “willful participant in joint action with the State or its agents.” Dennis v. Sparks, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). Courts have typically looked to “whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights.” Gallagher, 49 F.3d at 1453. If state and private officials have engaged in a substantial degree of cooperative action, or if state participation is “overt and significant” in facilitating the deprivation of constitutional rights, a court will find state action. Id. at 1454 (citation omitted).
Finally, under the symbiotic relationship test, state action will be present if the state “has so far insinuated itself into a position of interdependence” with a private party that “it must be recognized as a joint participant in the challenged activity.” Burton v. Wilmington Parking Auth., 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). By way of elucidation, “extensive state regulation, the receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the government and a private entity that is required for state action.” Gallagher, 49 F.3d at 1451; see also Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 175, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) (originating the language of “symbiotic relationship”).
Last year in Brentwood, the Court both supplemented and clarified these variously competing tests by invoking the concept of “entwinement.” 531 U.S. at 302, 121 S.Ct. 924. Noting that “[w]hat is fairly attributable is a matter of normative judgment, and [that] the criteria lack rigid simplicity,” the Court realistically observed that “no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government.” Brentwood, 531 U.S. at 295, 121 S.Ct. 924. Although proximate to the symbiotic relationship test, Johnson (Orozco), 293 F.3d at 1204-1205, the notion of entwinement recognizes that the four foregoing tests are, for all intents and purposes, tools for factual analysis that “bear on the fairness of ... an attribution [of state action.]” Id. (quoting Brentwood, 531 U.S. at 296, 121 S.Ct. 924). Accord *1177 ingly, Brentwood implores courts to apply the tests only so far as they force courts to zero in on the fact-intensive character of a state action determination. Johnson (Orozco), 293 F.3d at 1206.
In Brentwood, the Court determined that a secondary school athletic association, which was comprised of member private and public schools, and regulated interscholastic sports among its members, engaged in state action when it enforced a rule restricting the recruitment of student-athletes. Brentwood, 531 U.S. at 291, 121 S.Ct. 924. In reaching its determination, the Court highlighted that 84% of the association’s member schools were public schools; that each member school was represented by a principal or a faculty member who chose members of the association’s legislative council and board of control from among eligible principals, assistant principals and superintendents; that public school officials “overwhelmingly performed all but the purely ministerial acts” of the association; that the association’s staff was eligible to join Tennessee’s public retirement program for its employees; and that a state board of education member served as an ex-officio member of the association’s board. Id. at 298-299, 121 S.Ct. 924. All of these facts coalesced to form the basis of the Court’s holding that “regulatory activity may and should be treated as state action owing to the pervasive entwinement of the state school officials in the structure of the association, there being no offsetting reason to see the association’s acts in any other way.” Id. at 291, 121 S.Ct. 924.
Although “[a]pplication of the state action doctrine has been characterized as one of the more slippery and troublesome areas of civil rights litigation,” Gallagher, 49 F.3d at 1447, the case before us hardly resembles a doctrinal ice skating rink. Very closely resembling the Brent-wood facts, the Review Board’s decision to deny Tool Box’s application constitutes state action through Justice Souter’s felicitous expression, “entwinement.” When Ogden City mapped out new industrial park plats in 1995, the municipality entered into protective covenants with grantees. Paragraph III of the Ogden Commercial and Industrial Park Protective Covenants mandated the creation of a “special approval committee” — the “Industrial Park Review Board” — to enforce the covenants, choosing, without guidelines, which businesses could open and which could not. The Mayor of Ogden City selected the committee’s three members, two of whom would be Ogden City employees and one of whom would be an industrial park land owner or her representative.
As in Brentwood, the existence of a single non-municipal member does not transform the Review Board into a private actor. Such an argument would necessarily have to contend with the Mayor’s installation of two Ogden City employees on the three-member approval panel. Most damning is that the Mayor himself hears and has final authority over all appeals from Review Board decisions. The lone way to categorize the Review Board’s decision as that of a private actor would be to turn a blind eye to structural realities — all of which point to the inescapable conclusion that the review board engaged in “conduct ... fairly attributable to the State.” Lugar, 457 U.S. at 937, 102 S.Ct. 2744.
V.
Government officials and sundry state actors may impact protected symbolic speech such as nude dancing only through content-neutral “time, place or manner” restrictions. City of Renton v. Playtime Theatres, 475 U.S. 41, 46, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Content-neutral laws are those regulations not fa- *1178 dally intended to suppress protected expression, but which may have inadvertent restrictive effects on speech. Va. Pharmacy Bd. v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 778, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Most often, such content-neutral restrictions appear in two shades: 1) as incidental regulations of symbolic speech; or 2) as “time, place or manner” restrictions. In distinguishing between the former and the latter, the Court has developed dueling analytical rubrics with which to evaluate the constitutionality of a given regulation. See Christopher T. Leahy, Comment, The First Amendment Gone Awry: City of Erie v. Pap’s AM., Ailing Analytical Structures, and the Suppression of Protected Expression, 150 U. Pa. L.Rev. 1021, 1034-35 (2002) (evaluating the previously parallel development of the two standards before addressing their later intersection in City of Erie v. Pap’s A.M.).
Courts examine the first type of content-neutral regulations under the four-pronged O’Brien test — used by the district court in granting summary judgment to Ogden City. In upholding the constitutionality of a regulation banning the burning of draft cards, the Supreme Court in O’Brien fashioned the lens through which courts shall view disputed regulations that incidentally prohibit protected expression:
[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. 391 U.S. at 377, 88 S.Ct. 1673.
The district court applied the O’Brien test to the protective covenants to determine that Ogden City had the authority to regulate land use; that the covenants furthered the important governmental interest of preserving the land as an industrial park; that Ogden City’s interest in preserving the industrial park was unrelated to the suppression of free expression; and that the incidental restriction on Tool Box’s First Amendment rights of expression through nude dancing was no greater than essential to the furtherance of preserving the land as an industrial park.
By contrast, valid “time, place or manner” regulations are content-neutral laws that do not ban protected speech altogether, but rather relegate it to certain times, areas, or means of communication. Young v. Am. Mini Theatres, 427 U.S. 50, 63 n. 18, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). This form of speech regulation will pass constitutional muster if 1) the government has a substantial interest in the regulation that is unrelated to the suppression of ideas; 2) the means are narrowly tailored to the goal of the regulation; and 3) reasonable alternative avenues of expression are left open. Erznoznik v. City of Jacksonville, 422 U.S. 205, 217, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). In the realm of SOB regulations, the most common “time, place, or manner” restrictions to come within the borders of this test are zoning ordinances. Am. Mini Theatres, 427 U.S. at 54-55, 96 S.Ct. 2440. Courts typically uphold zoning ordinances that effectively ostracize SOBs because the regulations are construed to have the substantial interest of minimizing the “secondary effects” of such businesses — not of restricting the protected expression. City of Renton, 475 U.S. at 47, 106 S.Ct. 925; Z.J. Gifts D-2, L.L.C. v. City of Aurora, 136 F.3d 683, 686 (10th Cir.1998).
Although the Court has seemingly wallpapered over the “time, place or manner” inquiry with the O’Brien test in the context of regulations that incidental *1179 ly impact protected speech, see, e.g., Pap’s A.M., 529 U.S. at 289, 120 S.Ct. 1382; Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 804-817, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), that analytical confluence — and indeed the O’Brien test — does not come into play in the realm of regulations, such as the protective covenants here. The protective covenants do not incidentally impact protected speech but merely permit such impact through the discretion of the Review Board and the Mayor, the district court erred in considering the protective covenants under the O’Brien test. In themselves, they in no way prohibit nude dancing as did the law that outlawed the burning of draft cards in O’Brien.
Accordingly, the district court erred in exclusively relying on the O’Brien analysis because the protective covenants did not directly impact protected expression.
VI.
Because the O’Brien test does not apply, we move to the mode of analysis that the district court should have considered, that of prior restraint. Although the government may regulate the time, place or manner of protected expression, the courts will not validate statutes that make protected expression subject to “prior restraint”— that is, subject to “official approval under laws that delegate[] standardless discretionary power to local functionaries.” Am. Mini Theatres, 427 U.S. at 60 n. 17, 96 S.Ct. 2440 (citing Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969)); Essence, Inc. v. City of Fed. Heights, 285 F.3d 1272, 1290 (10th Cir.2002). Thus, because it is not the language of the covenants themselves that impact protected expression, but the granting to the Review Board power that may implicate the First Amendment.
In Shuttlesworth v. City of Birmingham, the Court struck down a city ordinance that forced paraders and demonstrators to secure a permit from a commission that could choose arbitrarily whether to grant the license. 394 U.S. at 149, 89 S.Ct. 935. The Court concluded that “an ordinance which ... makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official — as by requiring a permit or license which may be granted or withheld in the discretion of such an official — is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.” Id. at 151, 89 S.Ct. 935. Clarifying their position lest any doubt remain, the Court added that “a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to [engage in protected expression] according to their own opinions regarding the potential effect of the activity in question on the welfare, decency, or morals of the community.” Id. at 153, 89 S.Ct. 935.
With regard to prior restraint, we cannot uphold regulations that “fail[] to provide adequate procedural safeguards to ensure against the unlimited suppression of constitutionally protected speech.” FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 227, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); Essence, 285 F.3d at 1290. In the same year in which Ogden City passed its SOB ordinance, the Court in FW/PBS detailed its position on regulations that authorize unlawful prior restraint in the context of SOB licensing schemes. In invalidating a Dallas ordinance that failed to set time limits in which the licensing authority must grant a license to an SOB, the Court initially confirmed that courts shall not tolerate a licensing scheme that “placets] unbridled discretion in the hands of a government *1180 official or agency [because it] constitutes prior restraint and may result in censorship.” FW/PBS, 493 U.S. at 225-226, 110 S.Ct. 596 (citing City of Lakewood v. Plain Dealer Publ’g Co., 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)). The Court subsequently built on its previous decision in Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), to invoke two factors of a triumvirate of procedural safeguards that must be met to ward off a charge of prior restraint: “(1) any restraint prior to judicial review can be imposed only for a specified, brief period during which the status quo must be maintained; [and] (2) expeditious judicial review of that decision must be available.” FW/PBS, 493 U.S. at 227, 110 S.Ct. 596 (citing Freedman, 380 U.S. at 56-60, 85 S.Ct. 734).[1] Applying the factors, the Court struck down a motion picture censorship system that compelled prospective speakers’ silence by neglecting to place definite limitations on the time by which the licensor must issue the license.
Although FW/PBS implicates nebulous time limitations as distinguished from the nonexistent standards of the protective covenants, the Court resolved that restrictions that require governmental approval prior to engaging in protected expression receive review under the Freedman prior restraint analysis. FW/PBS, 493 U.S. at 229-230, 110 S.Ct. 596; see also Franken Equities, L.L.C. v. City of Evanston, 967 F.Supp. 1233, 1236 (D.Wyo.1997) (rejecting the argument that the time, place or manner analysis used in City of Renton also applies to special use permit requirements, and settling instead on the Freedman and FW/PBS approach). Indeed, prior restraints in the form of licensing schemes may not stand scrutiny when such schemes permit government officials unfettered discretion to grant or deny permission to engage in protected expression. Id. at 223-227, 110 S.Ct. 596.
Although Justice White and Chief Justice Rehnquist contended in their FW/PBS dissent that the Freedman approach should not apply to such licensing schemes that require governmental approval prior to engaging in protected expression, a majority nonetheless endorsed the application of Freedman’s first two factors. In his concurring opinion joined by Justices Marshall and Blackmun, Justice Brennan merely championed the application of the third Freedman factor. FW/PBS, 493 U.S. at 238-242, 110 S.Ct. 596 (Brennan, J., concurring). Perhaps more significantly, neither Justice White nor the Chief Justice wavered from the “settled law” recognized by all nine Justices: “[u]nbridled discretion with respect to the criteria used in deciding whether or not to grant a license is deemed to convert an otherwise valid law into an unconstitutional prior restraint.” Id. at 246, 110 S.Ct. 596 (White, J., dissenting) (citing Shuttlesworth, 394 U.S. at 150-152, 89 S.Ct. 935).
Finally, Ogden City looks to our decision in O’Connor v. City & County of Denver, 894 F.2d 1210, 1220 (10th Cir.1990), for the proposition that municipal ordinances that “[do] not ban the presentation of any forms of entertainment or grant officials the discretion to suppress any speech based on its content” are not prior restraints. The statement is indeed true, but Ogden City’s characterization of our holding is flawed. We concluded more precisely that the licensing provisions at issue were constitutionally valid exactly *1181 because they granted no discretion to the licensing official in considering the applications of theaters showing sexually explicit motion pictures. Prospective licensees needed only show that their businesses had complied with basic health and safety regulations. O’Connor, 894 F.2d at 1221.
Because the protective covenants in the case at bar provide unbridled discretion to the Review Board in determining whether a lawful business may open up shop in the industrial park, the district court erred by failing to apply the prior restraint approach delineated in Freedman as filtered through FW/PBS. That the Mayor may use his standardless “discretion” to affirm the Review Board’s equally standardless decision only underscores the propriety of the prior restraint analysis. Although Ogden City’s SOB ordinance declares that Tool Box may locate its business in the industrial park, the subsequent protective covenants leave it up to the unbridled discretion of the Review Board and the Mayor to decree which protected businesses may operate within an area in which they are already entitled to operate — a form of prior restraint.
For the foregoing reasons, we REVERSE the grant of summary judgment in favor of Ogden City.

. The third Freedman factor — requiring the censor to go to court to suppress the speech and bear the burden of proof once in court— •found support in only three Justices in FW/ PBS, whereas five Justices embraced the first two. FW/PBS, 493 U.S. at 238-242, 110 S.Ct. 596.