**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 23 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHRISTOPHER E. HARTNETT;
LACEY HARTNETT and GABRIEL
HARTNETT, minor children, by parent
and next friend, Christopher E.
Hartnett,

        Plaintiffs - Appellants,

v.

P. TERRENCE O'ROURKE, M.D.;
COLORADO SPRINGS SURGICAL
ASSOCIATES, P.C.,

        Defendants - Appellees.

No. 01-1470
(D.C. No. 98-B-2812)
(D. Colorado)

---

**ORDER AND JUDGMENT** *

---

Before **HENRY** , **BRORBY** , and **LUCERO** , Circuit Judges.

Christopher Hartnett, Lacey Hartnett, and Gabriel Hartnett filed this

diversity medical malpractice action after Dawn Hartnett (the wife of Christopher

and the mother of Lacey and Gabriel) died following abdominal surgery

---

* This order and judgment is not binding precedent, except under the
doctrines of res judicata, collateral estoppel, and law of the case. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

performed by the defendant Terrence O'Rourke, M.D., at Penrose Hospital.[1]  The

Hartnetts alleged that Dr. O'Rourke had failed to comport with the applicable

standard of care by applying only one ligature of the splenic artery, which led to a

massive hemorrhage, and, ultimately brain death.  They asserted that Dr.

O'Rourke's employer, Colorado Springs Surgical Associates, was vicariously

liable for his negligence and that other medical personnel at Penrose Hospital had

acted negligently during Dawn Hartnett's surgery and post-operative care.[2]

The district court granted summary judgment to Dr. O'Rourke and his

employer, relying on deposition testimony from Dr. O'Rourke and the surgeon

who assisted him, both of whom testified that Dr. O'Rourke had used two

ligatures on the splenic artery.  The court also concluded that the facts did not

warrant the application of the doctrine of res ipsa loquitur  In a separate order that

is also challenged in this appeal, the district court denied the Hartnetts' request to

inspect medical records pertaining to other surgeries performed by Dr. O'Rourke.

Upon review of the record, we conclude that the Hartnetts have offered

sufficient evidence in support of their one-ligature theory to render summary

judgment unwarranted.  We therefore vacate the district court's judgment and

---

[1]  At the time, Penrose Hospital was operated by Catholic Health Initiatives Mountain Region, an entity that the Hartnetts also named as a defendant in their complaint.

[2]  The Hartnetts' claims against Penrose Hospital were subsequently resolved and are not at issue in this appeal.

remand the case for further proceedings. However, we further conclude that the district court did not err in refusing to apply the doctrine of res ipsa loquitur. We do not address the Hartnetts' challenge to the district court's refusal to allow inspection of the records of other surgeries, allowing the parties to revisit that issue in the subsequent district court proceedings.

## I. BACKGROUND

We begin with a description of Dawn Hartnett's surgeries. Then, we outline the proceedings in the district court.

### A. Dawn Hartnett's Surgery

In December 1996, Dawn Hartnett, a 31-year-old mother of two, was diagnosed with a pancreatic mass. On January 3, 1997, the defendant Dr. Terrence O'Rourke performed surgery on Mrs. Harntett, removing her spleen, 60% of her pancreas, and a benign cyst. In order to prevent further bleeding, Dr. O'Rourke ligated the splenic artery. The parties agree that, in performing this procedure, the appropriate method is to apply a double ligature.

Both Dr. O'Rourke and the vascular surgeon who assisted him in the operation, Dr. William C. Chambers, Jr., testified in their depositions that Dr. O'Rourke applied a double ligature. However, Dr. O'Rourke's post-operative notes do not expressly refer to a double ligature. The notes state:

> Splenic artery <u>was ligated</u> as it came off the celiac and splenic vein ligated as it terminated into the portal vein.

Aplts' App. at 119 (emphasis added).

Initially, the surgery appeared to be successful, and Mrs. Hartnett was transferred to the recovery room in stable condition. However, two hours later, Mrs. Hartnett suffered massive internal bleeding and lost consciousness. In an emergency surgical procedure, Dr. O'Rourke reopened the abdominal incision, observed bleeding from the splenic artery and the tumor bed, and removed a large volume of blood. His post-operative notes describe this second operation as follows:

> There was approximately 1500 cc of clotted blood within the abdomen which was rapidly removed. Pressure was applied to the area of the previous dissection. Once the patient was stabilized, it could be seen that there was bleeding from the splenic artery. This was controlled with a clamp and <u>suture ligatures</u>. In addition, there were multiple sites of bleeding in the tumor bed from small veins. These were controlled with suture ligation, clipping, and pressure. There were numerous sutures of 5-0 Prolene and suture ligatures of 3-0 silk.
>
> The patient became progressively stable throughout the procedure . . . . .
>
> Sterile dressings were applied, and the patient was brought back to the intensive care unit in critical, but stable condition.

<u>Id.</u> at 120 (emphasis added).

Despite these efforts, Mrs. Hartnett suffered ischemic encephalopathy (brain injury from decreased blood flow) and never regained consciousness. A neurologist later concluded that she had suffered irreversible brain damage. The family elected to discontinue life support, and, tragically, Mrs. Hartnett died on January 9, 1997.

## B. The District Court Proceedings

The Hartnetts filed this diversity action against Dr. O'Rourke, Colorado Springs Surgical Associates, P.C., and Catholic Health Initiatives Mountain Region, asserting claims for negligence and lack of informed consent. The Hartnetts' negligence theory was based primarily on Dawn Hartnett's medical records and on the testimony of their expert, Dr. Mark Gordon, a general surgeon who reviewed Dawn Hartnett's medical records, wrote a report and an affidavit, and gave deposition testimony. Dr. Gordon's June 23, 1999 report states:

> There are several points in this case that do not meet the standard of care. Slippage of splenic artery free ties are known to occur and given a case where there is significant inflammation and difficulty with splenectomy [,] a double ligature including a distal suture ligature should have been utilized. Regarding the nursing care, vital signs, including central venous pressure and arterial line monitoring in a patient undergoing surgery of this magnitude was not performed. This is a breach of the standard of care. The nurses were not in close attendance and the resuscitation effort was slow and ineffective, resulting in prolonged hypotension and severe brain damage. The intensive care

> nursing in this case was woefully inadequate and the response to the acute emergency of cardiovascular collapse and shock was below the standard and resulted in the death of this patient. There can be no justification for this to have occurred in a close monitored situation such as the intensive care unit.

Id. at 42-43.

In deposition testimony, Dr. Gordon explained that his conclusion that a double ligature was not used was based on his interpretation of Dr. O'Rourke's notes after the two surgeries:

> I have two operative notes. I have the note of the original surgery and I have the note of approximately three hours later, a little less than that when the patient is back in the operating room being reexplored for massive hemorrhage. The first operative note doesn't mention double ligation, it says ligated and it's very specific about that. Says ligated the artery, ligated the vein and then the second operative note says there was adequate room to get a double ligature on when we went back. Given that type of language, it's natural for me to interpret it verbatim.

Id. at 87.

Dr. Gordon also explained that his conclusion was based in part on his knowledge of how surgical notes are typically written. Finally, Dr. Gordon stated that if in fact Dr. O'Rourke had double ligated the splenic artery, it was unclear to Dr. Gordon how the artery could have ruptured. He explained that "a doubly ligated vessel and particularly a doubly ligated vessel that's distally suture ligated doesn't slip. This is a very unusual case." Id.

-6-

In contrast, the defendants presented testimony indicating that ligatures may fail (and arteries rupture) for many reasons. In particular, Dr. Jack Pickelman testified that "possible explanations" for the bleeding of Mrs. Hartnett's splenic artery after the surgery included "[t]he ligatures . . . com[ing] off, . . . the sutures . . . fail[ing], or the ligatures . . . in and of themselves damag[ing] the artery, cut[ing] through the artery." Id. at 123. Dr. Bruce L. Gewertz testified that "one possib[le] [cause of the bleeding] is that the ties cut through the artery, that the splenic artery was thin and/or inflamed and that with the constant arterial pressure of the several hours after surgery that the artery was necrosed or fell apart at the point of ligature." Id. at 125. According to Dr. Gewertz, other possible explanations were that "[t]he knot could have come undone" or "[t]he suture could have broken." Id.

Another defense expert, Dr. William Fry, stated that the pulsations of the splenic artery could have possibly caused the bleeding. See id. at 127. Dr. Fry also explained that Mrs. Hartnett could have had a seizure. Id. at 128.

Finally, Dr. Ihor J. Fedorak listed the following possible causes of the bleeding: "failure of th[e] ligation," "mechanical failure of the suture material," and "erosion of the suture material through an inflamed splenic artery wall." Id. at 130. According to Dr. Fedorak, the latter was the most likely cause because "it

fits with the time course of Ms. Hartnett's collapse." Id.[3]

After the parties conducted discovery, the defendants moved for summary judgment, primarily on the grounds that Drs. O'Rourke and Chambers both testified that Dr. O'Rourke used two ligatures on the splenic artery during the first surgery and that the expert testimony indicated that there were many possible causes of the bleeding. The district court accepted both arguments and granted summary judgment to the defendants on the Hartnetts' negligence claim against Dr. O'Rourke and Colorado Springs Surgical Associates.

The Hartnetts then filed a motion to reconsider the summary judgment ruling. They attached an affidavit of Dr. Gordon in which he made additional statements about the possible causes of the bleeding. The district court denied the motion.

## II. DISCUSSION

On appeal, the Hartnetts argue that the district court erred in granting summary judgment to Dr. O'Rourke for three reasons. First, they contend that there is evidence in the record indicating that Dr. O'Rourke used only one ligature

---

[3] Dr. Fedorak explained that " [i]f there were to be an immediate problem with the technique of the ligation of the vessels or an inadequacy of the ligation of the vessels, I suspect the bleeding would have presented much earlier, in the recovery room or prior to the completion of the [surgical] case." Aplts' App. at 130.

-8-

on Mrs. Hartnett's splenic artery. Combined with evidence that the appropriate standard of care requires two ligatures, the Hartnetts argue that a reasonable juror could conclude that Dr. O'Rourke's negligence caused Mrs. Hartnett's fatal complications. The Hartnetts further contend that the district court erred in refusing to apply the doctrine of res ipsa loquitur to support their negligence claim.

Finally, the Hartnetts also challenge one of the district court's discovery rulings. They argue that the court erred in refusing to grant their motion to compel the production of Dr. O'Rourke's notes regarding other surgeries.

### A. Summary Judgment Ruling

We review the grant of summary judgment de novo, applying the same standard as the district court pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. See Tool Box v. Ogden City Corp., 316 F.3d 1167, 1173 (10th Cir. 2003). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We view the record in the light most favorable to the nonmoving party, see Tool Box, 316 F.3d at 1173, considering factual inferences tending to show triable issues in

the light most favorable to the existence of those issues. See Riley v. Brown & Root, Inc., 896 F.2d 474, 476 (10th Cir. 1990).

"Where different ultimate inferences may properly be drawn, the case is not one for a summary judgment." Luckett v. Bethlehem Steel, Corp., 618 F.2d 1373, 1377 (10th Cir. 1980). Thus, at the summary judgment stage, the court may not "assess the credibility of . . . conflicting testimony." Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1557 (10th Cir. 1995); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). Moreover, "the jury's unique competence in applying the 'reasonable man' standard is thought ordinarily to preclude summary judgment in negligence cases." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 450 n.12 (1976) (citing 10 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 2729 (1973)).

In this diversity action, we apply the substantive law of Colorado. Grant v. Pharmacia & Upjohn Co., 314 F.3d 488, 491 (10th Cir. 2002). Under Colorado law, a plaintiff establishes a prima facie case of negligence by proving the following elements: (1) the existence of a legal duty owed to her by the defendant; (2) a breach of that duty, (3) injury to the plaintiff, and (4) a causal

relationship between the defendant's breach and the plaintiff's injury. See Gerrity Oil & Gas Corp. v. Magness, 946 P.2d 913, 929 (Colo. 1997).

Here, the dispute concerns only the second element—whether Dr. O'Rourke breached the duty of care that he owed to Mrs. Hartnett. Moreover, even as to that element, the parties agree that as a physician holding himself out as a specialist in the field of surgery, Dr. O'Rourke owed Mrs. Hartnett a duty of care commensurate with that of a reasonable physician practicing in that field. See generally Kaiser Foundation Health Plan of Colorado v. Sharp, 741 P.2d 714, 718 (Colo. 1987). The parties also do not dispute that in these circumstances, a reasonable surgeon would have applied two ligatures to Mrs. Hartnett's splenic artery, and that, if indeed Dr. O'Rourke only applied one ligature, a reasonable jury could conclude that Dr. O'Rourke breached his duty of care and that there was a causal connection between this breach and Mrs. Hartnett's injuries and death. Accordingly, the issue of whether summary judgment was warranted turns on whether the Hartnetts offered sufficient evidence that Dr. O'Rourke did not apply two ligatures.

1. Evidence of a Single Ligature

The Hartnetts first argue that there is evidence in the record directly indicating that Dr. O'Rourke applied only one ligature to Mrs. Hartnett's splenic artery. In advancing this argument, the Hartnetts rely primarily on Dr. O'Rourke's notes regarding the initial surgery, which state that the splenic artery "was ligated." Aplts' App. at 119. The Hartnetts contrast that description with Dr. O'Rourke's notes regarding the second surgery, which refer to his having applied "suture ligatures." Id. at 120 (emphasis added). The Harnetts contend that from the specific use of the plural in the second set of notes, a factfinder could conclude that, when Dr. O'Rourke stated in the first set of notes that the artery "was ligated," he meant that he applied only one ligature.

The Hartnetts also rely on the testimony of their expert, Dr. Gordon. As we have noted, Dr. Gordon explained in deposition testimony that his opinion that Dr. O'Rourke had applied only one ligature to the splenic artery during the first surgery was based on a review of Dr. O'Rourke's notes. Dr. Gordon also explained that his conclusion was based in part on his knowledge of how surgical notes are typically written. He stated that "[b]ecause of the nature of a suture ligature, one usually places a second ligature proximal to the suture ligature and in the course of the dictation, one usually dictates it was doubly ligated." Id. at 86. When asked whether "the specificity of operative dictations can vary from report to report with the same surgeon," Dr. Gordon responded:

-12-

> That I don't know. I know in my own case and I have to go from personal experience and from other operative notes that I've read that in general, surgeons use the same type of language most of the time for the report. As I said, in terms of ligature, ligated or doubly ligated are pretty standard terminology for most surgeons.

Id. at 87.

Finally, the Hartnetts point to the following deposition testimony of Dr. Chambers, the surgeon who assisted Dr. O'Rourke in the initial operation:

> I recall he [Dr. O'Rourke] used a silk suture ligature on the splenic artery. He ligated the smaller pancreatic veins with, I believe, a 5-0 or 4-0 Prolene, and then he used a free tie on the –to follow that on the splenic artery of silk.

Id. at 34. According to the Hartnetts this testimony indicates that Dr. O'Rourke applied only one ligature. See Aplts' Reply Br. at 3 (contending that "with both references to the silk suture, [Dr. Chambers] [is] referring to one and the same suture").

In response, Dr. O'Rourke invokes his own deposition testimony and that of Dr. Chambers. As to the latter, Dr. O'Rourke contends that the Hartnetts' interpretation is not plausible. He maintains that because a "suture ligature" and "free tie" are two different kinds of ligatures, Dr. Chambers' account cannot be reasonably read to support the Hartnetts' one-ligature theory.

We agree that the deposition testimony of Dr. O'Rourke indicates that he applied two ligatures to Mrs. Hartnetts' splenic artery. In particular, Dr.

-13-

O'Rourke testified that, although his notes of the first surgery do not describe the number of ligatures, he remembers that he did doubly ligate Mrs. Hartnett's splenic artery. He added, "With major arteries, I always doubly ligate." Aplts' App. at 30.

As to Dr. Chambers' testimony, we note that, in describing the first surgery, he referred to two different kinds of ligatures—a "suture ligature" and a "free tie." See Aplts' App. at 34; see also Alton v. Kitt, 431 N.E.2d 417, 421 (Ill. App. 1982) (noting the distinction between suture ligatures and free ties). The Hartnetts' contention that Dr. Chambers' testimony supports their theory is thus not plausible: his testimony does indicate that Dr. O'Rourke used two ligatures.

Nevertheless, the testimony of Dr. O'Rourke and Dr. Chambers is not the only evidence in the record regarding the number of ligatures. As noted above, Dr. O'Rourke's written account of the first surgery undermines his own testimony. Not only did he use a phrase— "was ligated"—that is consistent with only one ligature having been applied, but he also used the plural "sutures" in the description of other phases of the first surgery. See Aplts' App. at 119 (stating that "subcutaneous tissue [was] irrigated with Betadine and closed with interrupted sutures of 3-0 Vicryl") (emphasis added). Moreover, as the Hartnetts have observed, Dr. O'Rourke used the plural in describing his repair of the splenic artery during the second surgery. See id. at 120 (stating that "bleeding

-14-

from the splenic artery . . . was controlled with a clamp and suture <u>ligatures</u>")
(emphasis added). The notes of the second surgery also use the plural in
describing other ligatures. See <u>id.</u> (stating that "subcutaneous tissue was irrigated
with Betadine and closed with interrupted <u>sutures</u> of 3-0 Vicryl") (emphasis
added). This specific use of the plural to describe other ligatures provides
support for the Hartnetts' contention that the phrase "was ligated" was used by
Dr. O'Rourke to refer to one ligature.

Dr. Gordon's testimony also undermines the testimony of Drs. O'Rourke
and Chambers regarding the number of ligatures. Dr. Gordon stated that when a
surgeon applies two ligatures to an artery, "one usually dictates [that the artery]
was doubly ligated" and that "ligated or doubly ligated are pretty standard
terminology for most surgeons." <u>Id.</u> at 86-87. Thus, according to Dr. Gordon, the
use of the phrase "was ligated" in the notes of the first surgery, when contrasted
with the reference to the application of "sutur<u>es</u>" to the splenic artery in the notes
of the second surgery, supports the conclusion that Dr. O'Rourke used only one
ligature.

In granting summary judgment to the defendants, the district court
characterized Dr. O'Rourke's notes as "ambiguous," but the court added that "Dr.
Gordon's assumptions based on [the notes] are not sufficient to create a genuine
issue of material fact." <u>See id.</u> at 165 (District Court Order filed Aug. 2, 2000).

According to the district court, "[t]he Hartnetts have presented no credible evidence that the artery was not doubly ligated." Id.  The court cited cases in which experts' conclusory opinions, based on evidence not in the record, were held insufficient to defeat summary judgment.  See id. (citing Evers v. General Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985); American Key Corp v. Cole Nat'l Corp., 762 F.2d 1569, 1580 (11th Cir. 1985), and Merit Motors Inc. v. Chrysler Corp., 569 F.2d 666, 672-74 (D.C. Cir. 1974)).  In so concluding, the district court misread the record evidence and did not properly apply the governing principles regarding summary judgment motions.

As to the record, we note that, unlike the expert opinions in the cases cited by the district court, Dr. Gordon's opinion was based upon evidence presented to the district court—Dr. O'Rourke's own notes—as well as Dr. Gordon's view that "one usually dictates [that the artery] was doubly ligated" and that "'ligated' or 'doubly ligated' are pretty standard terminology for most surgeons." Aplts' App. at 86-87  That evidence from Dr. Gordon and Dr. O'Rourke's own notes is arguably inconsistent with the deposition testimony of Drs. O'Rourke and Chambers regarding the number of ligatures and raises a question of whether the latter testimony is credible.  Cf. Sealock v. Colorado, 218 F.3d 1205, 1212 (10th Cir. 2000) (reversing the grant of summary judgment in light of inconsistency between medical records and defendant's testimony).

-16-

In light of the Hartnetts' evidence, the district court's reliance on the deposition testimony of Drs. O'Rourke and Chambers constituted a "[c]redibility determination[], [a] weighing of evidence, and [a] drawing of . . .inferences from the facts," functions properly performed by the jury rather than "[the] judge [when] he is ruling on a motion for summary judgment." Anderson, 477 U.S. at 255; see also Starr, 54 F.3d at 1557 (stating that, at the summary judgment stage, the court may not "assess the credibility of . . . conflicting testimony"). When viewed in the light most favorable to the Hartnetts (the non-moving parties), see Tool Box, 316 F.3d at 1173, Dr. O'Rourke's notes and Dr. Gordon's testimony provide evidence from which a reasonable juror could conclude by a preponderance of the evidence that Dr. O'Rourke applied only one ligature to the splenic artery during the first surgery and that, as a result, he failed to exercise a duty of care commensurate with that of a reasonable physician practicing in the field. See Kaiser Foundation, 741 P.2d at 718.

To be sure, a reasonable juror could also find Dr. O'Rourke's and Dr. Chambers' account of the first surgery entirely credible, concluding that Dr. O'Rourke applied two ligatures and that the use of the phrase "was ligated" in the notes of the first surgery was merely an abbreviated way in which to describe the application of more than one ligature. However, such matters should be resolved by the factfinder at trial rather than on summary judgment. See Anderson, 477

U.S. at 255.  Accordingly, we conclude that the district court erred in granting summary judgment to Dr. O'Rourke on the Hartnetts' negligence claim.

2.  Res Ipsa Loquitur

The Hartnetts also argue that the district court erred in refusing to allow them to present their case to a jury on the theory of res ipsa loquitur.

As the parties note, in order to establish a prima facie case of res ipsa loquitur under Colorado law, the plaintiffs must establish that (1) the event is the kind which ordinarily does not occur in the absence of negligence; (2) possible causes other than the defendant's negligence are sufficiently eliminated by the evidence; and (3) the indicated negligence was within the scope of the defendant's duty to the plaintiff.  See Holmes v. Gamble, 655 P.2d 405, 408 (Colo. 1982).   The plaintiffs must present evidence that, when viewed in the light most favorable to them, "establishes that the existence of each element of that doctrine is more probable than not."  Id. at 409.

In order to establish these elements, the plaintiffs need not eliminate every possible cause other than the defendant's negligence.  Ravin v. Gambrell ex rel Eddy, 788 P.2d 817, 822 (Colo. 1990); see also Montgomary Elevator Co. v. Gordon, 619 P.2d 66, 69 (Colo. 1980)  ("'The plaintiff is not required to exclude all other possible conclusions beyond a reasonable doubt, and it is enough that he

makes out a case from which the jury may reasonably conclude that the negligence was more probably than not, that of the defendant." quoting Restatement (Second) of Torts § 328D, Comment f). However, "[w]hen it can, with equal reasonableness, be inferred that the accident in question was due to another cause than the negligence of the defendant, the doctrine cannot be invoked." Bettner v. Boring, 764 P.2d 829, 832 n.2 (Colo. 1988) (internal quotation marks and emphasis omitted); see also Holmes, 655 P.2d at 408-09 (noting that "[w]here the probabilities are at best evenly balanced between negligence and its absence, it becomes the duty of the court to direct a verdict for the defendant" and finding the doctrine inapplicable when "it [was] at least equally likely that a cause other than the defendant's negligence was the basis of [the plaintiff's] injury").

The doctrine of res ipsa loquitur has most often been applied when the existence of the first element—that the event is the kind which ordinarily does not occur in the absence of negligence—is apparent. See Holmes v. Gamble, 624 P.2d 905, 907 (Colo. Ct. App. 1980), aff'd, 655 P.2d 405 (Colo. 1982) (stating that "[t]he doctrine . . . has been applied in medical malpractice cases where the cause of the injury or damage is so apparent that laymen are equally as able as experts to conclude that such things do not happen in the absence of negligence" and citing as examples of cases in which the doctrine applies, a surgeon's leaving

a sponge inside a patient and the expulsive loss of an eye during cataract surgery). However, more recent cases have held that this element may be satisfied by expert testimony. See generally Seavers v. Methodist Med. Ctr. of Oak Ridge, 9 S.W.3d 86, 93-94 (Tenn. 1999) (observing that "[i[n a majority of states which have addressed this issue, medical malpractice claimants are allowed to come forward with expert testimony to support a res ipsa inference" and adopting the majority rule). Colorado decisions have followed the majority rule. See, e.g., Holmes, 624 P.2d at 907 (stating that because "it cannot be inferred from the injury itself that it could not have occurred without negligence on the part of the defendants . . . expert testimony on that issue is necessary before the doctrine of res ipsa loquitur can be applied").

Here, the Hartnetts argue that the res ipsa loquitur doctrine is applicable and renders summary judgment to Dr. O'Rourke unwarranted. They invoke Dr. Gordon's testimony that "a double ligated vessel that's distally suture ligated doesn't slip" and that "this is a very unusual case." Aplts' App. at 87. The Hartnetts also cite statistics regarding the likelihood of complications from the type of surgery at issue. See Aplts' Br. at 26 (citing statement from a medical journal that distal pacreatectomies have "a post-operative mortality rate of only 0.9%, with a post-operative hemorrhage complication occurring in only 4% of the cases"). The Hartnetts also invoke Dr. O'Rourke's statement of reassurance to

them before the surgery—that up to 400 of these operations had been successfully performed.

Upon review of the expert testimony regarding the possible causes of the bleeding of Mrs. Hartnett's splenic artery, we agree with the district court that, even when the record is viewed in the light most favorable to the Hartnetts, the evidence is insufficient to submit the case to the jury under the doctrine of res ipsa loquitur. As noted above, the defendants' experts offered several alternative explanations of the bleeding. In light of those possible explanations, the general statements of Dr. Gordon regarding the rarity of the kind of bleeding suffered by Mrs. Hartnett are insufficient to support the inference by a preponderance of the evidence that Mrs. Hartnett's splenic artery bled because Dr. O'Rourke applied only one ligature. Thus, as to the Hartnetts' res ipsa loquitur claim, "the probabilities are at best evenly balanced between negligence and its absence." Holmes, 655 P.2d at 408-09. Similarly, the statistical evidence cited by the Hartnetts, although establishing that this tragic outcome was unusual, does not establish that Dr. O'Rourke's negligence was probably the cause. Cf. Quin v. George Washington Univ., 407 A.2d 580, 584 (D.C. 1979) (affirming the trial court's refusal to instruct the jury on a res ipsa loquitur theory because "a review of the evidence shows [that] two equally plausible conclusions were deducible, [i]. e., the hole in the splenic vein arose from improper ligation by the surgeons,

or from natural causes (spontaneous rupture)" and "[t]he presence of conflicting medical testimony indicates a lack of consensus in the medical field as to the cause of abdominal hemorrhaging following a splenectomy, despite agreement that such hemorrhaging is a rarity").

Accordingly, we conclude that the district court properly held that the doctrine of res ipsa loquitur is inapplicable to the Hartnetts' negligence claim against Dr. O'Rourke.

### B. Denial Of The Hartnetts' Motion to Compel

Finally, the Hartnetts argue that the district court erred in denying their motion to compel production of notes from Dr. O'Rourke's prior surgeries. We owe considerable deference to the district court's rulings on discovery matters, reviewing its decisions only for an abuse of discretion. Soma Med. Int'l v. Standard Chartered Bank, 196 F.3d 1292, 1300 (10th Cir. 1999). "Under this standard, a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Nieto v. Kapoor, 268 F.3d 1208, 1221 (10th Cir. 2001) (internal quotation marks omitted).

Here, the procedural posture in which this issue was raised is relevant to its appropriate disposition. In particular, the record indicates that after the Hartnetts requested these records, the defendants objected on the grounds that production of the documents would be unduly burdensome. The Hartnetts then filed a motion to compel production of the documents. The defendants filed an objection to the motion, arguing in part, that the Hartnetts had failed to engage in reasonable, good faith efforts to confer with opposing counsel to resolve the disputed matter, as required by a local rule of the Colorado federal district court and Fed. R. Civ . P. 37. In particular, the defendants reported that:

> In their Motion to Compel, Plaintiffs claim that an attempt was made to comply with D.C. Colo. L.R. 7.1 by sending a letter to counsel for Dr. O'Rourke by facsimile "to attempt to discuss this matter but was unable to speak with him." On February 14, 2000, the day Plaintiffs' Motion to Compel was mailed, counsel faxed a letter stating: "We are getting ready to file our Motion to Compel the production of Dr. O'Rourke's Operative Reports pertaining to prior surgeries. If there is a chance we could resolve this without filing a motion, please call my office today and ask for either [counsel's paralegal or secretary]." . . . This eleventh hour letter, placing the burden on Defendant's counsel to contact Plaintiffs' counsel, cannot be characterized as "reasonable, good faith efforts to confer with opposing counsel to resolve the disputed matter." D.C. Colo. L.R. 7.1(A). Defense counsel did in fact call and was informed Mr. Carey [one of the lawyers for the Hartnetts] was out of state and Mr. Rector [the other lawyer for the Hartnetts] was away from the office. No return call was received from plaintiff counsel.

Aplee Supp. App. at 6.

In denying the Hartnetts' motion to compel, the district court cited the Colorado local rule and Fed. R. Civ. P. 37. The court also concluded that the request for other operative reports was unduly burdensome.

In our view, it is unclear from this record whether the production of these potentially important records would be unduly burdensome. However, the district court's reliance on the procedural rules requiring the moving party to seek out-of-court resolution of discovery disputes (D.C. Colo. L.R. 7.1(A) and Fed. R. Civ. P. 37) is within the court's province.

Moreover, the Hartnetts' opening brief fails to challenge the district court's finding that the Hartnetts failed to comply with these rules. See Aplts' Br. at 29 (arguing that the district court abused its discretion in denying the motion to compel production of Dr. O'Rourke's notes but failing to address the district court's ruling that the Hartnetts failed to comply with D.C. Colo, L.R. 7.1(A) and Fed. R. Civ. P. 37 before filing their motion to compel). Because the Hartnetts did not raise the issue in their opening brief, they have waived it. See State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994).[4]

---

[4] In their reply brief, the Hartnetts do present an argument that they complied with the requirement that they confer with opposing counsel before filing their motion to compel. In particular, they contend that before they filed the motion, they attempted to call defendants' counsel and that when that proved unsuccessful, they faxed a letter to opposing counsel requesting that the defendants' counsel speak to one of the Hartnetts' counsel's paralegals if they

(continued...)

Accordingly, we will not review the district court's denial of the Hartnetts'

motion to compel, based upon their failure to comply with D.C. Colo. L.R. 7.1(A)

and Fed. R. Civ. P. 37.   The defendants substantive objection to the Hartnetts'

discovery request (that the request was unduly burdensome) is also not properly

before us.

Nevertheless, we note that the documents sought by the Hartnetts could be

quite significant: If notes from other surgeries established that Dr. O'Rourke

usually employed the phrase "double ligature" or a similar term when he applied

two ligatures, then his failure to do so in the notes of the first surgery here would

constitute some evidence that he only used one ligature, thus supporting the

Hartnetts' contention.  On the other hand, if in the notes of other surgeries Dr.

O'Rourke regularly used the phase "was ligated" to indicate that he applied more

than one ligature, then these notes could provide support for his testimony that he

used two ligatures in Mrs. Hartnett's first surgery.  Accordingly, in light of our

---

[4](...continued)
wanted to discuss the motion to compel.  According to the Hartnetts' counsel, the
defendants' counsel did not call the paralegals but instead requested to speak to
the Hartnetts' counsel personally.

In their response to the Hartnetts' motion to compel, the defendants note
that these efforts to resolve this discovery dispute were initiated on the same day
that the Hartnetts' counsel mailed the motion to compel.  Accordingly, we see
little indication that the district court abused its discretion in concluding that
these eleventh hour efforts to resolve the discovery dispute were insufficient to
comply with D.C. Colo. L.R. 7.1(A) and Fed. R. Civ. P. 37.

vacating the grant of summary judgment and remanding the case for further proceedings, the district court should allow further opportunity for discovery and should exercise its sound discretion should further disputes arise involving these records.

## III. CONCLUSION

We VACATE the grant of summary judgment to the defendants and REMAND the case to the district court for further proceedings consistent with this order and judgment.

Entered for the Court,

Robert H. Henry
Circuit Judge

.